SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  A Limited Liability Partnership
  Including Professional Corporations
CHARLES L. KREINDLER, Cal. Bar No. 119933
ckreindler@sheppardmullin.com
JENNIFER G. REDMOND, Cal. Bar No. 144790
jredmond@sheppardmullin.com
TRAVIS J. ANDERSON, Cal. Bar No. 265540
tanderson@sheppardmullin.com
333 South Hope Street, 43rd Floor
Los Angeles, California 90071-1422
Telephone:  213.620.1780
Facsimile:   213.620.1398

Attorneys for GLOBAL-IP CAYMAN,
and GLOBAL IP USA, INC.

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, SOUTHERN DIVISION

| | |
|---|---|
| EMIL YOUSSEFZADEH, an individual, and UMAR JAVED, an individual,<br><br>            Plaintiffs,<br><br>        v.<br><br>GLOBAL-IP CAYMAN, a Cayman Islands company; GLOBAL-IP USA, INC., a Delaware corporation; DONG YIN DEVELOPMENT (HOLDINGS) LIMITED, a Hong Kong company; and DOES 1 through 50, inclusive,<br><br>            Defendants. | Case No. 2:18-cv-2522-JLS (JCGx)<br><br>*Hon. Josephine L. Staton*<br><br>**DEFENDANTS GLOBAL-IP CAYMAN AND GLOBAL-IP USA, INC.'S NOTICE OF MOTION AND MOTION TO COMPEL ARBITRATION AND STAY JUDICIAL PROCEEDINGS; AND MEMORANDUM OF POINTS AND AUTHORITIES**<br><br>[Concurrently filed: Declarations of Charles L. Kreindler, Bahram Pourmand, Yuen Cheung Wong, and Shiyue Liu; and [Proposed] Order]<br><br>Date:     June 29, 2018<br>Time:    2:30 p.m.<br>Ctrm.:   10A<br><br>Complaint Filed: February 23, 2018 |

TO THE HONORABLE COURT, ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that on June 29, 2018, at 2:30 p.m. or as soon thereafter as the matter may be considered by the Honorable Josephine L. Staton in Courtroom 10A of the above-entitled Court, Global-IP Cayman ("GIP Cayman"), and Global IP USA, Inc. ("GIP USA") (collectively "GIP") will, and hereby do, move this Court for an order: (1) compelling arbitration of the dispute in this matter, as framed by the Complaint, between plaintiffs Emil Youssefzadeh and Umar Javed ("Plaintiffs") and GIP, to the extent plaintiffs pursue these claims; and (2) staying this case in its entirety pending resolution of such arbitration.

GIP makes this Motion on the grounds that Plaintiffs' claims against GIP must be arbitrated pursuant to a valid, enforceable agreement to arbitrate contained in the Series A Preferred Share Purchase Agreement and Shareholders Agreement entered into by and between Plaintiffs and GIP Cayman.

This Motion is made following the conference of counsel pursuant to Local Rule 7-3, which occurred on April 9, 2018. Declaration of Charles L. Kreindler, ¶ 2.

This Motion is based upon this notice, the attached memorandum of points and authorities in support thereof, the Declarations of Charles L. Kreindler, Bahram Pourmand, Yuen Cheung Wong, and Shiyue Liu (and all exhibits attached thereto)

1  filed herewith, such other matters of which the Court may properly take notice, and

2  upon such oral argument as may be made at the hearing on this Motion.

3  Dated:  May 3, 2018

4                                          SHEPPARD, MULLIN, RICHTER & HAMPTON

5                                          LLP

6

7                              By

8                                          _____
                                           /s/ Charles L. Kreindler
                                           CHARLES L. KREINDLER

9                                          JENNIFER G. REDMOND
                                           TRAVIS J. ANDERSON

10

11                                         Attorneys for Global-IP Cayman and
                                           Global IP USA, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES...........................................8

I.  INTRODUCTION ......................................................................................8

II. FACTUAL & PROCEDURAL BACKGROUND .......................................10

    A.  Background and Cast of Characters.................................................10

    B.  The Investment Agreement ............................................................11

    C.  Plaintiffs' Employment by GIP .....................................................13

    D.  Plaintiffs' Dispute with the Series A Directors ............................14

    E.  Plaintiffs' Notice of Breach ...........................................................15

    F.  Plaintiffs' Resignation...................................................................16

    G.  The Present Action .........................................................................17

III. ARGUMENT .............................................................................................17

    A.  The Convention on the Recognition and Enforcement of Foreign
        Arbitral Awards Governs the Investment Agreement's
        Arbitration Provision..................................................................17

    B.  The Arbitration Provision in the Investment Agreement is Valid
        and Enforceable Under the Convention.....................................19

    C.  The Claims Asserted in the Complaint Fall within the Scope of
        the Arbitration Provision in the Investment Agreement.............20

    D.  Plaintiffs' Employment Agreements, Which Pre-Date the Notice
        of Breach, Do Not Defeat Applicability of the Investment
        Agreement..................................................................................22

    E.  GIP USA Has the Right to Compel Arbitration ............................24

    F.  This Court Should Stay This Action Pending Arbitration..............25

V.  CONCLUSION ..........................................................................................26

<u>TABLE OF AUTHORITIES</u>

Page(s)

<u>Cases</u>

*Amisil Holdings Ltd. v. Clarium Capital Management*
    622 F. Supp. 2d 825 (N.D. Cal. 2007)............................................................24, 25

*Anders v. Hometown Mortg. Servs., Inc.*
    346 F.3d 1024 (11th Cir. 2003) ............................................................21

*Arnold v. Arnold Corp.*
    920 F.2d 1269 (6th Cir. 1990) ............................................................24

*AT&T Techs. v. Communs. Workers of Am.*
    475 U.S. 643 (1986) ............................................................20

*ATSA of California, Inc. v. Continental Ins. Co.*
    702 F.2d 172 (9th Cir. 1983) ............................................................23

*Balen v. Holland America Line Inc.*
    583 F.3d 647 (9th Cir. 2009) ............................................................18

*Ballard v. Corinthian Colleges, Inc.*
    2006 WL 2380668 (W.D. Wash. Aug. 16, 2006) ............................................................26

*Bautista v. Star Cruises*
    396 F.3d 1289 (11th Cir.2005) ............................................................19

*Chloe Z Fishing Co. v. Odyssey Re (London) Ltd.*
    109 F. Supp. 2d 1236 (S.D. Cal. 2000) ............................................................17

*Dean Witter Reynolds, Inc. v. Byrd*
    470 U.S. 213 (1985) ............................................................18

*Dworkin-Cosell Interair Courier Services, Inc. v. Avraham*
    728 F. Supp. 156 (S.D.N.Y. 1989) ............................................................19

*Eazy Electronics & Technology, LLC v. LG Electronics, Inc.*
    226 F.Supp.3d 68 (D.P.R. 2016) ............................................................19

*Hansen v. KPMG, LLP*
    2005 WL 6051705 (C.D. Cal. Mar. 29, 2005) ............................................................25

*Hawkins v. KPMG LLP*
    423 F. Supp. 2d 1038 (N.D. Cal. 2006)...............................................................25

*Hinson v. Jusco*
    868 F. Supp. 145 (D.S.C. 1994) .......................................................................23

*LaPine v. Kyocera Corp.*
    2008 WL 2168914 (N.D. Cal. May 23, 2008) ....................................................17

*Letizia v. Prudential Bache Securities, Inc.*
    802 F.2d 1185 (9th Cir.1986).............................................................................24

*Martin Marietta Aluminum, Inc. v. Gen. Elec. Co.*
    586 F.2d 143 (9th Cir. 1978) .............................................................................25

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*
    473 U.S. 614 (1985) ........................................................................17, 19, 20, 21

*Montoya v. Comcast Corporation*
    2016 WL 5340651 (E.D. Cal. Sept. 23, 2016) ..................................................25

*Mundi v. Union Sec. Life Ins. Co.*
    555 F.3d 1042 (9th Cir. 2009) ...........................................................................24

*Nicaragua v. Standard Fruit Co.*
    937 F.2d 469 (9th Cir. 1991) .............................................................................18

*Operating Engineers v. Flair Builders, Inc.*
    406 U.S. 487 (1972) ..........................................................................................20

*Otan Inv., LLC v. Trans Pacific Trading, Ltd.*
    2006 WL 1075225 (W.D. Wash. April 20, 2006)...............................................23

*Patnik v. Citicorp Bank Trust FSB*
    412 F. Supp. 2d 753 (N.D. Ohio 2005) .............................................................26

*Powell v. Gulf States Inc.*
    2005 WL 757509 (N.D. Cal. April 4, 2005) .......................................................26

*Prima Paint Corp. v. Flood & Conklin Mfg. Co.*
    388 U.S. 395 (1967) ..........................................................................................20

*Quiksilver Greater China Limited v. Quiksilver Glorious Sun Licensing
Limited*
    2012 WL 12878644 (C.D. Cal. Nov. 2, 2012) ...................................................19

*Ramirez-Baker v. Beazer Homes, Inc.*
    636 F. Supp. 2d 1008 (E.D. Cal. 2008) .................................................. 22

*Riley v. Kingsley Underwriting Agencies, Ltd.*
    969 F.2d 953, 960 (10th Cir. 1992) ........................................................ 19

*Reynoso v. Bayside Management Company*
    LLC, 2013 WL 6173765 (N.D. Cal. Nov. 25, 2013) ............................. 22

*Ryan v. BuckleySandler, LLP*
    69 F. Supp. 3d 140 (D.D.C. 2014).......................................................... 22

*Simula, Inc. v. Autoliv, Inc.*
    175 F.3d 716 (9th Cir. 1999) .................................................................. 20

*Soto v. American Honda Motor Co., Inc.*
    946 F. Supp. 2d 949 (N.D. Cal. 2012)..................................................... 25

*Terra Holding GmbH v. Unitrans Intern., Inc.*
    124 F. Supp. 3d 745 (E.D. Va. 2015) ..................................................... 19

*Thanou v. Cornerstone Securities*
    LLC, 2010 WL 11549893 (C.D. Cal. Oct. 21, 2010)............................. 26

<u>Statutes</u>

9 U.S.C. § 3.................................................................................................. 25

9 U.S.C. §§ 201–208................................................................................... 17

9 U.S.C. § 2.................................................................................................. 18

9 U.S.C. § 202.................................................................................... 17, 18, 19

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.   INTRODUCTION

Plaintiffs Emil Youssefzadeh and Umar Javed (collectively "Plaintiffs") are owner-shareholders, former directors (as of February 28, 2018), and former employees (as of June 26, 2017) of Defendant Global-IP Cayman ("GIP Cayman"), a satellite company they founded in 2013 for the purpose of providing internet access to parts of Africa.  To obtain funding for their satellite business, Plaintiffs sold 75% of the equity of GIP Cayman in June 2016 to non-party Bronzelink Holdings Limited, a company incorporated under the laws of the British Virgin Islands and headquartered in Hong Kong ("Bronzelink"), in return for an investment of $175,000,000.  In connection with that sale, Plaintiffs negotiated and entered into a comprehensive Series A Preferred Share Purchase Agreement ("SPA") and a Shareholders Agreement, which is an exhibit to the SPA (collectively, the "Investment Agreement"), that govern, among other things, the structure, authority, and procedures for management of GIP Cayman by its Board of Directors (the "GIP Board"), as well as Plaintiffs' day-to-day responsibilities and authority as members of the "GIP Team."  Critical to this motion, the Investment Agreement also contains a broad dispute resolution provision that obligates all of the contracting parties, including Plaintiffs and GIP Cayman, to submit **_"any dispute"_** to binding arbitration in Hong Kong.

In exchange for its considerable capital investment into GIP Cayman, Bronzelink acquired the right, which it duly exercised, to appoint a majority (6 out of 9) of the members of the GIP Board (the "Series A Directors").  Plaintiffs apparently expected Bronzelink to be a silent partner despite its 75% ownership of GIP Cayman, and they quickly expressed their displeasure with the actions of the Series A Directors and their frustration with their own diminished control over GIP Cayman.  Plaintiffs clashed with the Series A Directors regarding the management of GIP Cayman, including the terms of a proposed sales incentive plan and whether

to pursue certain financing.  These disagreements led Plaintiffs to assert that actions taken by the Series A Directors were indicative of their intent to violate U.S. law, and to send a Notice of Breach of the Investment Agreement to Bronzelink, alleging conduct nearly identical to conduct alleged in the current lawsuit.  These disagreements are at the core of the present wrongful termination/retaliation lawsuit, which Plaintiffs initiated against GIP Cayman and its wholly-owned subsidiary, Global IP USA, Inc. ("GIP USA") (collectively, GIP Cayman and GIP USA are "GIP") in California state court in defiance of their agreement to arbitrate any dispute.

Although Plaintiffs take extraordinary pains to avoid mentioning it in their Complaint, and artfully attempt to portray their dispute with GIP as limited to their rights as employees, the resolution of Plaintiffs' claims necessitates interpretation of the Investment Agreement.  To illustrate, none of the following issues underpinning Plaintiffs' claims can be resolved without interpretation and application of the Investment Agreement:

- whether Plaintiffs had standing to demand the GIP Board actions that the Series A Directors allegedly quashed;
- whether Plaintiffs properly noticed meetings of the GIP Board;
- whether the Series A Directors acted properly or improperly in defeating quorums with respect to meetings noticed by Plaintiffs;
- whether the Series A Directors were permitted to appoint an Executive Director of GIP Cayman; and
- whether the Series A Directors' conduct improperly interfered with Plaintiffs' performance of tasks assigned to them under the Investment Agreement.

As the meaning and application of the Investment Agreement is subject to binding arbitration in an international forum, to which Plaintiffs consented, and because Plaintiffs' claims against GIP "touch matters" governed by that Agreement,

the United Nations Convention on the Recognition and Enforcement of Arbitral Awards, the Federal Arbitration Act ("FAA"), and controlling Supreme Court precedent require Plaintiffs to resolve those claims through binding arbitration. Accordingly, GIP requests that the Court enter an Order compelling arbitration to the extent Plaintiffs pursue these claims against GIP, and staying this action in its entirety pending completion of such arbitration.

## II.   FACTUAL & PROCEDURAL BACKGROUND

### A.   Background and Cast of Characters

Plaintiffs formed GIP Cayman in 2013 as part of a project to develop, launch, and operate a communications satellite to provide internet connectivity to users in Africa.  Complaint, ¶¶ 2, 18.[1]  GIP Cayman later formed GIP USA as its wholly-owned subsidiary.  *Id.* at ¶ 45.  After determining that GIP Cayman lacked the money necessary to fund the satellite project to completion, Plaintiffs decided to raise financing by selling stock in GIP Cayman to private investors.  *Id.* at ¶ 19. Through their efforts to attract investors for GIP Cayman, Plaintiffs were introduced to Bronzelink, a company incorporated under the laws of the British Virgin Islands and headquartered in Hong Kong.  *Id.* at ¶ 39; Declaration of Yuen Cheung Wong, ¶ 2.

In June 2016, Bronzelink acquired 75% of the equity in GIP Cayman.  *See* Complaint, ¶ 40.  In connection with its acquisition of 75% of GIP Cayman's equity, Bronzelink entered into the SPA and the Shareholders Agreement, which is an

[1]   As used herein, citations to "Complaint" refer to the Complaint filed in the present action, which was provisionally sealed in response to GIP's assertion that it contains and reveals attorney-client privileged and confidential materials.  In preparing this Memorandum, GIP has taken care to paraphrase the Complaint's allegations in a manner that accurately reflects the source material, but avoids disclosure of GIP's privileged and confidential information.  Accordingly, citations to the Complaint are not intended to be, and should not be construed as, a waiver on the part of GIP of any privilege or right to confidentiality attaching to any material therein.

exhibit to the SPA (collectively, the "Investment Agreement"), with Plaintiffs relating to their respective ownership interests in GIP Cayman.  Declaration of Bahram Pourmand ("Pourmand Decl."), Exh. A ("SPA"), pp. 1-2 & Exh. B ("Shareholders Agreement"), pp. 1-2.  Bronzelink's assent to enter into the SPA was expressly conditioned on Plaintiffs' execution of the Shareholders Agreement.  SPA, p. 2 ("WHEREAS, Bronzelink has required, as a condition to its willingness to enter into this Agreement, that the Company and the GIP Team enter into the Shareholders Agreement in the form of Exhibit B hereto concurrently with the Closing").  The other parties to the Investment Agreement in addition to Plaintiffs and Bronzelink are GIP Cayman, STM Atlantic N.V., a company incorporated under the laws of the Netherlands, Steadyspace Limited, a company incorporated under the laws of the British Virgin Islands, and two other individuals: Bahram Pourmand and Amir Irani.  *Id* at pp. 1-2; Shareholders Agreement, pp. 1-2.  Within the Investment Agreement, GIP Cayman is referred to as the "Company."  *Id*.

Pursuant to the Investment Agreement, Bronzelink was entitled to, and did, appoint six directors to the nine-person GIP Board (the "Series A Directors").  Dkt. 1 at p. 107, ¶ 2;[2] Complaint, ¶ 40.  Plaintiffs were each appointed as directors to the GIP Board by GIP Cayman's common shareholders.  *See* Shareholders Agreement, § 3.3(a)-(b); Dkt. 1 at p. 107, ¶ 4; Complaint, ¶ 41.

**B.    The Investment Agreement**

The Investment Agreement contains various provisions governing the structure, authority, and procedures for the GIP Board.  *See* Shareholders Agreement at pp. 10-15.  It specifies that decisions regarding the business and affairs of GIP Cayman shall be made by the GIP Board unless specifically delegated.  *Id.* at p. 10, § 3.1.  It specifies that the GIP Board will be composed of six "Series A Directors,"

---

[2]    As used herein, citations to "Dkt." refer to items docketed in the present action.

1  and three "Common Directors" (which include Plaintiffs).  *Id.* at p. 10, § 3.3(a)-(b).

2  It further provides that any subsidiary of GIP Cayman, such as GIP USA, shall have

3  a board with the same composition as that of GIP Cayman.  *Id.* at p. 10, § 3.3(c).  In

4  addition, the Investment Agreement specifies how and when a board member may

5  be removed, and how the board chairman shall be appointed and what his or her

6  voting rights will be.  *Id.* at pp. 10-11, §§ 3.4-3.5.

7       The Investment Agreement also specifies when GIP Board meetings may be

8  convened: "Board Meetings may be convened on no less than five (5) Business

9  Days written notice, unless unanimously agreed otherwise by the Directors."  *Id.* at

10  p. 11, § 3.6.  It also provides that board meetings require a quorum of at least two

11  Common Directors and three Series A Directors, subject to certain exceptions.  *Id.* at

12  p. 11, § 3.7.

13      Under the Investment Agreement, Plaintiffs are part of the "GIP Team" and

14  tasked with certain responsibilities to help GIP launch satellites into orbit and

15  provide connectivity to parts of the African continent.  *Id.* at pp. 1, 18; *see*

16  Complaint, ¶ 2.  Specifically, Section 7.1 of the Shareholders Agreement assigns the

17  following extensive list of responsibilities to Plaintiffs as members of the GIP Team:

18          (a)     Upon finalization of a Satellite Manufacture
        Agreement, the GIP Team shall use all commercially
19      reasonable efforts to procure contracted capacity
        commitments for the satellite on commercially reasonable
20      terms with credit worthy customers in an amount sufficient
        to close ... financing within the timeframe contemplated by
21      this Agreement.

22          (b)     The GIP Team shall be responsible for providing the
        following services to the Company:
23
            (i)      assist the Company to engage an independent
24      firm to undertake the necessary coordination works
        regarding the Primary Orbital Slots;
25
            (ii)     provide technical and management support to
26      the Company in respect of the Project;

27          (iii)    discuss and negotiate with the Company
        selected Satellite Manufacturer on the design of the
28      Satellite and participate in the commercial

> negotiations of a Satellite Manufacture Agreement making best efforts to have such agreement finalized and execution ready within ninety (90) days after the Series A Closing;
>
> (iv)   liaise and arrange discussions with the launch vehicle supplier in order to negotiate and finalize a launch services contract in respect of the Satellite;
>
> (v)   liaise and discuss with vendors regarding the supply of earth station and commend center equipment … and
>
> (vi)   obtain all necessary approvals from the relevant authorities in the United States of America in the event that clearance is required for the Satellite to provide coverage in the African market.

*Id.* at p. 18.

In addition, the parties to the Investment Agreement agreed to resolve ***any dispute*** through final and binding arbitration as follows:

> Each of the Parties irrevocably agrees that **any dispute** shall first be resolved amicably through direct negotiation among the parties.  If an amicable resolution cannot be achieved within sixty (60) days after written notice of one Party to another, then **any dispute** shall be resolved through final and binding arbitration in Hong Kong administered by the Hong Kong International Arbitration Centre ("HKIAC") under the HKIAC Administered Arbitration Rules.  The arbitration shall be conducted in the English language.  The number of arbitrators shall be three (3).  The Series A Holder shall nominate one arbitrator.  The Common Holders shall collectively nominate one arbitrator.  The two arbitrators so nominated and appointed shall nominate the third arbitrator.

*Id.* at pp. 44-45 (emphasis added).[3]

**C.   Plaintiffs' Employment by GIP**

In October 2016, Plaintiff Youssefzadeh entered into an employment agreement with GIP USA to serve as the Chief Technology Officer to both it and

---

[3]   The SPA contains functionally identical language on page 28.  The only differences between the arbitration provisions contained in the Shareholders Agreement and SPA are that where the former refers to the "Series A Holder" and the "Common Holders," the latter respectively refers to "Bronzelink" and the "GIP Team."

GIP Cayman.  Pourmand Decl., Exh. C; *See* Complaint, ¶¶ 48-49.  At the same time, Plaintiff Youssefzadeh also entered into a "Consulting Agreement" on behalf of an entity entitled "Salim Group, Inc." to provide the exact same services (and through which one-half of Plaintiff Youssefzadeh's compensation was routed).  Pourmand Decl., Exh. D.  At approximately the same time, Plaintiff Javed entered into employment agreements with GIP USA and GIP Cayman to serve as the President and Chief Operating Officer for both entities.  Pourmand Decl., Exhs. E &F;  *See* Complaint, ¶¶ 54-55.  None of Plaintiffs' employment-related agreements address the Investment Agreement or its dispute resolution provision in any way.  *See generally* Pourmand Decl., Exhs. C-F.  Likewise, none of them contain a forum selection clause.  *Id.*

### D.     Plaintiffs' Dispute with the Series A Directors

As alleged in Plaintiffs' Complaint, following execution of the Investment Agreement, a series of disputes arose between Plaintiffs, in their roles as shareholders, directors of GIP Cayman, and members of the GIP Team, and the Series A Directors.  Specifically, Plaintiffs allege that they became concerned following the appointment of the Series A Directors that the Series A Directors had caused or intended to cause GIP not to comply with certain laws applicable to the activities assigned to the GIP Team for execution.  Complaint, ¶¶ 22, 61-63.  Plaintiffs allegedly sought to raise these issues at noticed board meetings, but claim that each time the Series A Directors did not attend and thus defeated a quorum.  *Id.* at ¶¶ 70-71, 74-75, 80-81.  According to Plaintiffs, the Series A Directors thus stymied Plaintiffs' repeated attempts as board members to focus the GIP Board's attention on their concerns, and thereby rendered Plaintiffs unable to carry out the duties to develop the African satellite project (as delegated to them in the Investment Agreement).  *Id.*  Of course, GIP has a very different perspective on all of these issues, and contends that it was and has always been in full compliance with applicable law, and that Plaintiffs weaponized baseless legal compliance issues as a

tool to get GIP's new majority owner to back off and, in effect, allow them to take back control of GIP.

In addition, Plaintiffs allege in the Complaint that:

- the Series A Directors' refusal to appear at GIP Board meetings noticed by Plaintiffs prevented the GIP Board from considering a financing proposal that Plaintiffs wanted GIP Cayman to accept. *Id*. at ¶¶ 69-71, 74, 80-81;

- one of the Series A Directors unilaterally appointed himself "Executive Director" of GIP Cayman, claimed to wield unchecked authority over GIP Cayman, and thereafter retaliated against Plaintiffs for their efforts to steer the GIP Board agenda by allegedly telling them that they could not continue to serve as both GIP employees and GIP Cayman directors. *Id*. ¶¶ 67, 76, 78;

- just as the Series A Directors dictated the actions of GIP Cayman, they also dominated and dictated the decisions of GIP Cayman's subsidiary, GIP USA. *See, e.g.*, Complaint, ¶¶ 45, 63, 77, 92, 99; and

- that GIP Cayman and GIP USA acted in concert to stymie Plaintiffs' efforts to raise certain issues and compel their resignations. *See id.* at ¶ 88.

### E.  Plaintiffs' Notice of Breach

Before they appeared in Plaintiffs' Complaint, the disputes outlined above, among others, formed the basis of a June 4, 2017 letter captioned "Notice of Breach" sent to Bronzelink by Plaintiffs and other GIP Cayman shareholders ("Notice of Breach"). Pourmand Decl., Exh. G. The Notice of Breach specifically invokes the dispute resolution provisions in the SPA and Shareholders Agreements in an attempt to "amicably resolve" – as required by both Agreements – eight "Matters" of dispute, including substantially all of the disputes described in the current Complaint. *Id*. For example:

- With regard to Matter 3, the Notice of Breach complains: "Clause 10.8 of the Shareholders Agreement requires the Company to ensure that within requirements of applicable Law the parties enjoy the benefit of the Agreement. … [The] GIP Team have expressed their doubt to Bronzelink[.] Bronzelink and [the Series A Directors] have frustrated the effort by [Plaintiffs] and [the] GIP Team to discuss and put in place a reasonable process[.]  These actions by Bronzelink and [the Series A Directors] deny the . . . enjoyment of Common Shareholders of the benefit of the Agreement." *Id.* at p. 2.  *The same dispute is described in paragraphs 4-5, 22, 61-63, 70-71, 74-75, 78, and 80-81 of the Complaint*;

- With regard to Matter 2, the Notice of Breach complains: "Clause 6 of the Shareholders Agreement requires the Company to secure … financing[.]  The [Series A Directors] have blocked the approval … and frustrated the effort of the Company and [Plaintiffs] to convene a meeting of the board of directors to deliberate and approve the engagement of [Investment Bank] towards any alternate debt financing." *Id.*  *The same dispute is described in paragraphs 69-71, 74, 80-81, and 241 of the Complaint*; and

- With regard to Matter 6, the Notice of Breach complains: "One of the Series A [D]irectors … has assumed the position of "Executive Director" while no such position is defined in the Shareholders Agreement and the authority assumed by such person has not been approved in any resolution of the Board." *Id.* at p. 6.  *The same dispute is described in paragraphs 67, 76, and 78 of the Complaint.*

### F.    Plaintiffs' Resignation

Approximately three weeks after sending the Notice of Breach, Plaintiffs resigned their positions of employment with GIP, but retained their positions as directors of GIP Cayman.  Complaint, ¶ 83.  In an email sent on June 26, 2017 to GIP's senior employees, Plaintiff Javed offered the following explanation for his and Plaintiff Youssefzadeh's resignations:

> [A]s founders, Emil [Youssefzadeh] and myself own the majority of the common stock in the Company and our investors own the Series-A that controls the board.  Over the past few weeks we have made every effort to have a rational dialogue with our Series-A shareholder … and unfortunately this has not been successful.
>
> As a result of this, Emil [Youssefzadeh] and myself … have resigned today.  [ ] *The position Emil [Youssefzadeh] and I have taken as shareholders puts us in dispute with other series-A shareholders*.  This is a fight we intend to carry on vigorously.  [ ] *Emil [Youssefzadeh] and I will remain engaged as dissenting directors* … but will refrain from getting involved in the management and operation.

1  Declaration of Shiyue Liu ("Liu Decl."), ¶ 2 & Exh. A (emphasis added).

2  **G.      The Present Action**

3      On February 23, 2018, Plaintiffs commenced the present action in the

4  Superior Court of the State of California, County of Los Angeles, against GIP and

5  Dong Yin Development (Holdings) Limited.  GIP timely removed the action to this

6  Court.  Dkt. 1.  Based almost entirely on the disputes discussed above, Plaintiffs

7  have asserted claims against GIP purportedly sounding in employment, contract, and

8  tort law.  Conspicuously missing from the Complaint is any reference to the

9  Investment Agreement.

10  **III.   ARGUMENT**

11  **A.      The Convention on the Recognition and Enforcement of Foreign**

12          **Arbitral Awards Governs the Investment Agreement's Arbitration**

13          **Provision**

14      In 1970, the United States ratified the international treaty known as the

15  Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the

16  "Convention"), codified at 9 U.S.C. §§ 201–208.  *LaPine v. Kyocera Corp.*, 2008

17  WL 2168914, at *3 (N.D. Cal. May 23, 2008).  The Convention is applicable to

18  arbitration agreements "arising out of a legal relationship, whether contractual or

19  not, which is considered commercial, including a transaction, contract, or

20  agreement."  9 U.S.C. § 202.

21      The Convention's purposes are to "encourage the recognition and

22  enforcement of international arbitral awards" and "to relieve congestion in the

23  courts and to provide parties with an alternative method for dispute resolution that is

24  speedier and less costly than litigation."  *LaPine,* 2008 WL 2168914, at *3.  Indeed,

25  the strong federal policy favoring arbitration "applies with special force in the field

26  of international commerce."  *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,*

27  *Inc.* 473 U.S. 614, 631 (1985); *see also Chloe Z Fishing Co. v. Odyssey Re (London)*

28  *Ltd.*, 109 F. Supp. 2d 1236, 1241 (S.D. Cal. 2000) (recognizing that courts must be

"mindful of" the federal policy favoring arbitration in considering a motion to compel arbitration under the Convention).  To that end, "[o]nce a court determines that a valid arbitration agreement exists and that it applies to the parties' dispute, the inquiry ends and the court must direct the parties to arbitrate."  *Nicaragua v. Standard Fruit Co.*, 937 F.2d 469, 475 (9th Cir. 1991) (quoting *Perry v. Thomas*, 482 U.S. 483, 490 (1987)); *Dean Witter Reynolds, Inc. v. Byrd*, 470 U.S. 213, 218 (1985) (the FAA "leaves no place for the exercise of discretion by a district court, but instead mandates that district courts *shall* direct the parties to proceed to arbitration[]") (emphasis original).

"Courts generally address four factors to determine whether to enforce an arbitration agreement under the Convention.  [ ]  These four require that (1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states."  *Balen v. Holland America Line Inc.*, 583 F.3d 647, 654-655 (9th Cir. 2009) (citing and quoting *Bautista v. Star Cruises*, 396 F.3d 1289, 1294–95 and n. 7 (11th Cir.2005) and *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 449 and n. 13 (3d Cir.2003)).

Here, the Investment Agreement meets all four requirements.  The first requirement is satisfied because the Investment Agreement contains an agreement to arbitrate and is signed by Plaintiffs and GIP Cayman.[4]  9 U.S.C. §§ 2, 202.  The second requirement is satisfied because the Investment Agreement calls for arbitration to take place in Hong Kong, which is a signatory to the Convention.

---

[4]    To the extent that they are construed as separate agreements, each of the SPA and the Shareholders Agreement contain an agreement to arbitrate – two in total.

1   *See Quiksilver Greater China Limited v. Quiksilver Glorious Sun Licensing Limited*,

2   2012 WL 12878644 (C.D. Cal. Nov. 2, 2012).  The third requirement is satisfied

3   because the Investment Agreement, which contains the agreement to arbitrate, arises

4   out of a "legal relationship" that is "commercial" within the meaning of 9 U.S.C.

5   § 202.  *See Terra Holding GmbH v. Unitrans Intern., Inc.*, 124 F. Supp. 3d 745, 749

6   (E.D. Va. 2015) (shareholder agreement constitutes a legal, commercial relationship

7   for purposes of Convention); *Dworkin-Cosell Interair Courier Services, Inc. v.*

8   *Avraham*, 728 F. Supp. 156, 159 (S.D.N.Y. 1989) (same).  Finally, the fourth

9   requirement is met because several parties to the Investment Agreement, including

10   Bronzelink and GIP Cayman, are not American citizens.[5]  *See Eazy Electronics &*

11   *Technology, LLC v. LG Electronics, Inc.*, 226 F.Supp.3d 68, 75 (D.P.R. 2016)

12   (finding that corporation was citizen of foreign state for purposes of Convention

13   where it was organized pursuant to the laws of, and headquartered in, the Republic

14   of Korea).

15   **B.**     **The Arbitration Provision in the Investment Agreement is Valid**

16          **and Enforceable Under the Convention**

17          Article II of the Convention provides that an arbitration agreement must be

18   enforced unless it is "null and void, inoperative or incapable of being performed."

19   *Mitsubishi Motors*, 473 U.S. at 619 n.3 (citing Convention, Article II(3)).  The "null

20   and void" clause is narrowly construed.  *Riley v. Kingsley Underwriting Agencies*,

21   *Ltd*., 969 F.2d 953, 960 (10th Cir. 1992).  The scope of the clause "must be

22   interpreted to encompass only those situations—such as fraud, mistake, duress, and

23   waiver—that can be applied neutrally on an international scale.  *Bautista v. Star*

24   *Cruises*, 396 F.3d 1289, 1298–1300 (11th Cir. 2005).

25   _____

26   [5]   This requirement is also met because the commercial relationship created by
     the Investment Agreement is reasonably related to one or more foreign states
27   as it was formed to finance the development and launch of satellites to
     provide internet access in Africa.  Complaint, ¶¶ 2, 18-19.
28

Here, there is no cognizable defense that is capable of overriding Plaintiffs' assent to the arbitration provision in the Investment Agreement.  Plaintiffs initialed every page of the Investment Agreement, including the pages containing the arbitration provision.  *See generally*, SPA and Shareholders Agreement.  Plaintiffs further acknowledged the validity of the dispute resolution procedure contained in the Investment Agreement through their Notice of Breach.  *See* Pourmand Decl., Exh. G, p.1 ("The Dispute Resolution clause of the [SPA and Shareholders Agreement] require (sic) that any dispute is first resolved amicably if possible").  Therefore, the agreement to arbitrate is valid and enforceable under the Convention.  *See Prima Paint Corp. v. Flood & Conklin Mfg. Co.,* 388 U.S. 395, 403-404 (1967) ("in passing upon a § 3 application for a stay while the parties arbitrate, a federal court may consider only issues relating to the making and performance of the agreement to arbitrate," and not the contract as a whole).

## C.   The Claims Asserted in the Complaint Fall within the Scope of the Arbitration Provision in the Investment Agreement

To compel arbitration, the Court need only find, resolving all doubts in favor of arbitrability, that Plaintiffs' factual allegations "touch matters" covered by an agreement to arbitrate.  *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 721 (9th Cir. 1999); *Mitsubishi Motors*, 473 U.S. at 624 n. 13 (noting that "insofar as the allegations underlying the statutory claims touch matters covered by the enumerated articles, [we] properly resolve[ ] any doubts in favor of arbitrability").  The presumption of arbitrability "is particularly applicable where the clause is . . . broad," and in such cases, "[i]n the absence of any express provision excluding a particular grievance from arbitration, . . . only the most forceful evidence of a purpose to exclude the claim from arbitration can prevail."  *AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 654 (1986); *see Operating Engineers v. Flair Builders, Inc.*, 406 U.S. 487, 491 (1972) ("(O)nce a court finds that, as here, the parties are subject to an agreement to arbitrate, and that agreement extends to

1  'any difference' between them," it is required to consign the case to arbitration);
2  *Anders v. Hometown Mortg. Servs., Inc.*, 346 F.3d 1024, 1028 (11th Cir. 2003)
3  (compelling arbitration where the parties agreed to arbitrate "any dispute," holding
4  that the "agreement reaches this dispute because the agreement reaches any and all
5  disputes").  The presumption in favor of arbitration is also particularly applicable in
6  an international case such as this.  *See Mitsubishi Motors,* 473 U.S. at 615 (federal
7  policy in favor of arbitral dispute resolution applies with special force in
8  international commerce).

9       Here, Plaintiffs' factual allegations touch upon matters covered by the
10  Investment Agreement, which obligates the contracting parties to arbitrate ***any***
11  ***dispute*** without limitation.  Plaintiff Javed admitted as much when he told his
12  former GIP colleagues that positions he and Plaintiff Youssefzadeh had taken ***as***
13  ***shareholders*** created a dispute with the Series A Directors that led to Plaintiffs'
14  resignations.  Liu Decl., Exh. A.  The Complaint's allegations are consistent with
15  this admission.  The Complaint recounts how the Series A Directors allegedly
16  frustrated Plaintiffs' attempts as board members to raise their compliance-related
17  concerns and present a debt financing proposal at various board meetings.  Plaintiffs
18  allege the Series A Directors did so by not attending and defeating the quorum
19  required under the Investment Agreement.  Plaintiffs further allege that these actions
20  by the Series A Directors rendered Plaintiffs unable to fulfill their obligations to
21  develop the African satellite launch project – obligations arising directly from the
22  Investment Agreement – and also comply with the law, which in turn forced them to
23  resign.

24       Resolution of these claims necessitates interpretation and application of the
25  Investment Agreement, which sets forth rules governing the authority, composition,
26  and procedures for the GIP Board, including when and how a board meeting may be
27  noticed, and the quorum composition for a board meeting to be carried out.
28  Shareholders Agreement, pp. 10-15.  The Investment Agreement also specifically

delineates Plaintiffs' responsibilities to arrange and carry out the development, launch, and servicing of satellites to provide internet access for certain parts of Africa. *Id.* at p. 18. In light of the Notice of Breach, in which Plaintiffs specifically invoke the dispute resolution provisions in the Investment Agreement to resolve the **_exact_** same disputes now set forth in the Complaint, Plaintiffs cannot credibly deny the applicability of the Investment Agreement to these issues.

### D. Plaintiffs' Employment Agreements, Which Pre-Date the Notice of Breach, Do Not Defeat Applicability of the Investment Agreement

In meet and confer, Plaintiffs have asserted that their employment agreements are the sole agreements relevant to their current Complaint because those agreements do not contain arbitration clauses, are "integrated," and post-date the Investment Agreement. Whether Plaintiffs' employment agreements are integrated and/or contain arbitration provisions analogous to the those contained in the Investment Agreement do not control the arbitrability of Plaintiffs current claims against GIP. Where, as here, an integrated employment agreement is silent as to the forum for dispute resolution, courts have roundly determined that a pre-existing arbitration agreement remains enforceable. *See, e.g.*, *Ramirez-Baker v. Beazer Homes, Inc.*, 636 F. Supp. 2d 1008, 1017 (E.D. Cal. 2008) ("Since the written employment agreement was silent on the forum for dispute resolution, [the] arbitration agreement ... was probative and admissible as not inconsistent with the terms of such employment agreement ... [and] any doubts must be resolved in favor of arbitration"); *Reynoso v. Bayside Management Company*, LLC, 2013 WL 6173765, at *4 (N.D. Cal. Nov. 25, 2013) (finding that employment agreement did not render arbitration agreement unenforceable because the employment agreement did not contain a forum selection clause and its language was thus "reasonably susceptible to the meaning that it did not supersede the arbitration agreement"); *Ryan v. BuckleySandler, LLP*, 69 F. Supp. 3d 140, 146 (D.D.C. 2014) ("[C]ourts

1   throughout the country have enforced pre-existing arbitration agreements when a

2   subsequent agreement does not address the issue of arbitration").

3         Further, there is nothing in Plaintiffs' employment agreements that amends,

4   supersedes, rescinds or revises any portion of the Investment Agreement, including

5   its dispute resolution provision.  To be clear, Plaintiffs do not and cannot allege that

6   the Investment Agreement somehow ceased to exist upon the execution of their

7   employment agreements (which contain integration clauses only as to the

8   "employment of the Employee by the Company").  Indeed, it would be remarkably

9   disingenuous for Plaintiffs to argue otherwise given that their Notice of Breach

10  explicitly seeks to invoke the dispute resolution procedures of the Investment

11  Agreement approximately eight months ***after*** Plaintiffs executed their employment

12  agreements.

13        Finally, litigants cannot circumvent an agreement to arbitrate by artfully

14  omitting reference to such an agreement from their pleadings.  *ATSA of California,*

15  *Inc. v. Continental Ins. Co.*, 702 F.2d 172 (9th Cir. 1983) (finding that arbitration

16  clause in written agreement governed dispute between parties despite plaintiff's

17  contention that dispute arose from separate oral agreement without arbitration

18  clause); *see also Otan Inv., LLC v. Trans Pacific Trading, Ltd.*, 2006 WL 1075225

19  (W.D. Wash. April 20, 2006) (holding that agreement containing an arbitration

20  clause encompassed claims arising under a separate, subsequent contract because

21  the contracts were interrelated); *Hinson v. Jusco*, 868 F. Supp. 145, 148 (D.S.C.

22  1994) (compelling arbitration based on finding that dispute arose under "some

23  mixture" of two related contracts, where one contained an agreement to arbitrate).

24  As discussed above and evidenced by Plaintiffs' own Notice of Breach, GIP and

25  Plaintiffs agree that the disputes described in the Complaint arise under and

26  implicate the Investment Agreement.

27

28

### E.   <u>GIP USA Has the Right to Compel Arbitration</u>

GIP USA, a wholly-owned subsidiary of GIP Cayman, similarly has the right to enforce the arbitration provision contained in the Investment Agreement.  Non-signatories can enforce arbitration agreements on the basis of agency principles, as well as equitable estoppel.  *Letizia v. Prudential Bache Securities, Inc.*, 802 F.2d 1185, 1187–88 (9th Cir.1986); *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1046 (9th Cir. 2009).

"Agents of a signatory [to an agreement to arbitrate] can compel the other signatory to arbitrate so long as (1) the wrongful acts of the agents for which they are sued relate to their behavior as agents or in their capacity as agents … and (2) the claims against the agents arise out of or relate to the contract containing the arbitration clause."  *Amisil Holdings Ltd. v. Clarium Capital Management*, 622 F. Supp. 2d 825, 835 (N.D. Cal. 2007) (interpreting Ninth Circuit law).  Here, not only is GIP USA a wholly-owned subsidiary of GIP Cayman, but Plaintiffs themselves repeatedly allege that GIP USA was dominated and controlled by the Series A Directors of GIP Cayman, and that the two GIP entities worked in concert both to create the concerns voiced by Plaintiffs and to prevent Plaintiffs from addressing them.  Complaint, ¶¶ 15, 45, 63, 77, 88, 92, 99.  *Amisil Holdings Ltd*, 622 F. Supp. 2d at 838-839 (granting nonsignatory defendants' motion to compel arbitration where plaintiff alleged that nonsignatories were agents of signatory to agreement to arbitrate); *see also Arnold v. Arnold Corp.*, 920 F.2d 1269, 1281 (6th Cir. 1990) ("[I]f [a party] could avoid the practical consequences of an agreement to arbitrate by naming nonsignatory parties as [defendants] in his complaint . . . the effect of the rule requiring arbitration would, in effect, be nullified").  Thus, by the nature of Plaintiffs' own allegations, GIP USA may compel arbitration.

Equitable estoppel prevents a signatory to an arbitration agreement from avoiding arbitration on claims against a non-signatory where those claims are "inherently bound up with claims against a signatory."  *Amisil Holdings Ltd.*, 622 F.

Supp.2d at 840.  In that situation, "the court should compel arbitration in order to avoid denying the signatory the benefit of the arbitration clause, and in order to avoid duplicative litigation which undermines the efficiency of arbitration."  *Id.* at 840; *Hawkins v. KPMG LLP*, 423 F. Supp. 2d 1038, 1050 (N.D. Cal. 2006); *Hansen v. KPMG, LLP,* 2005 WL 6051705, at *3 (C.D. Cal. Mar. 29, 2005) (applying doctrine of equitable estoppel where plaintiff's complaint "describe[d] the non-signatory Defendants as one team involved in a single course of misconduct ... and [sought] to hold them jointly liable for each other's conduct").  Here, Plaintiffs repeatedly allege that GIP USA was dominated and controlled by the Series A Directors of GIP Cayman, that the Series A Directors were in turn dominated and controlled by Defendant Dong Yin, and that all Defendants worked in concert to both create the concerns voiced by Plaintiffs and to prevent Plaintiffs from addressing them.  Complaint, ¶¶ 15, 45, 63, 77, 88, 92, 99.  *See Soto v. American Honda Motor Co., Inc.*, 946 F. Supp. 2d 949, 955 (N.D. Cal. 2012) (finding close relationship between entities for purposes of equitable estoppel where signatory of arbitration agreement was a wholly-owned subsidiary of nonsignatory); *Montoya v. Comcast Corporation*, 2016 WL 5340651, at*5–*6 (E.D. Cal. Sept. 23, 2016) (finding claims "intertwined" with the contract where they presumed the existence of underlying contract benefits and obligations).  Accordingly, GIP USA can and hereby does invoke the agreement to arbitrate contained in the Investment Agreement.

### F.  This Court Should Stay This Action Pending Arbitration

Pursuant to 9 U.S.C. § 3, the Court may order a stay "pending compliance with a contractual arbitration clause."  *Martin Marietta Aluminum, Inc. v. Gen. Elec. Co.*, 586 F.2d 143, 147 (9th Cir. 1978).  As described above, Plaintiffs' claims are subject to arbitration.  This Court should thus stay this action pending the outcome of the arbitration.  In the alternative, if this Court were to find that some claims are arbitrable while others are not, the Court should compel arbitration of the arbitrable

claims and stay any remaining claims pending resolution of the arbitration.  A stay is justified for nonarbitrable claims that depend on the same facts and are inherently inseparable from the arbitrable claims.  *See, e.g., Patnik v. Citicorp Bank Trust FSB*, 412 F. Supp. 2d 753, 762 (N.D. Ohio 2005) (citing *Hill v. GE Power Sys., Inc.*, 282 F.3d 343, 347 (5th Cir. 2002)); *see also Powell v. Gulf States Inc.*, 2005 WL 757509, *4 (N.D. Cal. April 4, 2005) (citing *Harvey v. Joyce*, 199 F.3d 790, 795-796 *5th Cir. 2000) for the proposition that "a stay of the litigation is the preferred course of action" where "a co-defendant is subject to the arbitration agreement, and the movant's potential liability is based on the co-defendant's conduct, and such liability could have a critical impact on the co-defendant's right to arbitrate").

Here, the outcome of the arbitration will necessarily impact all claims asserted in the Complaint against all parties.  All claims depend on the same basic set of facts (*e.g.*, those concerning legal compliance, the consideration of project financing, and the appointment of an Executive Director, etc.), necessitate interpretation and application of the Investment Agreement, and cannot be separated from one another.  Under such circumstances, courts have stayed claims determined to be nonarbitrable.  *Powell*, 2005 WL 757509 at *4; *Ballard v. Corinthian Colleges, Inc.*, 2006 WL 2380668, *2 (W.D. Wash. Aug. 16, 2006) (granting motion to stay proceedings against non-signatory plaintiffs where claims asserted by all plaintiffs jointly were "grounded in identical facts and legal theories"); *Thanou v. Cornerstone Securities*, LLC, 2010 WL 11549893, *6 (C.D. Cal. Oct. 21, 2010) (granting nonsignatory defendant's motion to stay litigation where claims asserted against nonsignatory and signatory to arbitration agreement were substantially interdependent and intertwined).

## IV.   <u>CONCLUSION</u>

For the reasons set forth above, GIP respectfully requests that this Court grant GIP's Motion and compel arbitration to the extent Plaintiffs pursue their claims

1   against GIP.  GIP further requests that this Court stay these proceedings in their

2   entirety pending the outcome of the arbitration.

3   Dated:  May 3, 2018

4                                               SHEPPARD, MULLIN, RICHTER & HAMPTON

5                                               LLP

6

7                                   By    _____

                                                    */s/ Charles L. Kreindler*

8                                               CHARLES L. KREINDLER

                                                JENNIFER G. REDMOND

9                                               TRAVIS J. ANDERSON

10                                              Attorneys for Global-IP Cayman and Global IP

11                                              USA, Inc.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28