Jeffrey B. Isaacs, Esq., SBN 117104
Jerome H. Friedberg, Esq., SBN 125663
Paige Shen, Esq., SBN 162122
Robert Gookin, Esq., SBN 251601
**ISAACS | FRIEDBERG LLP**
555 S. Flower Street, Suite 4250
Los Angeles, California 90071
Telephone:  (213) 929-5534
Facsimile:  (213) 955-5794
Email:     jisaacs@ifcounsel.com
           jfriedberg@ifcounsel.com
           pshen@ifcounsel.com
           rgookin@ifcounsel.com

*Attorneys for Plaintiffs*
*Emil Youssefzadeh and Umar Javed*

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| EMIL YOUSSEFZADEH, an individual, and UMAR JAVED, an individual,<br><br>Plaintiffs,<br><br>vs.<br><br>GLOBAL-IP CAYMAN, a Cayman Islands company; GLOBAL IP-USA, INC, a Delaware corporation; DONG YIN (HOLDINGS) LTD., a Hong Kong unlimited company; and DOES 1 through 50, inclusive,<br><br>Defendants. | CASE NO. 2-18-cv-02522-JLS-JCG<br><br>Assigned to Hon. Josephine L. Staton<br><br>**PLAINTIFFS' OPPOSITION TO MOTION TO COMPEL ARBITRATION AND STAY JUDICIAL PROCEEDINGS**<br><br>[Filed concurrently with Declaration of Emil Youssefzadeh; Declaration of Umar Javed; and Compendium of Exhibits]<br><br><u>Hearing</u><br>Judge:      Hon. Josephine L. Staton<br>Date:       June 29, 2018<br>Time:       2:30 p.m.<br>Place:      Room 10A<br><br>Action Filed:  Feb. 23, 2018<br>Removed:       Mar. 28, 2018<br>Trial Date:    None |

**OPPOSITION TO MOTION TO COMPEL ARBITRATION**

244055.10

# **TABLE OF CONTENTS**

**Page**

I.    INTRODUCTION. ................................................................. 8

    A.    This Court Lacks Jurisdiction to Compel Arbitration as to GIP-USA. ................................................................................................ 8

    B.    The Court Should Not Compel Arbitration as to GIP-Cayman. ........... 8

        1.    The Arbitration Agreement Does Not Apply to This Dispute. ..................................................................................... 8

        2.    The Parol Evidence Rule Bars GIP From Relying on the SHA and the SPA. ....................................................................... 9

II.    STATEMENT OF FACTS. ................................................................ 10

    A.    The Satellite Project. ............................................................... 10

    B.    The June 2016 Transaction. ..................................................... 10

    C.    Mr. Youssefzadeh and Mr. Javed Become Consultants. ................... 12

    D.    GIP-USA is Incorporated in August 2016. ..................................... 12

    E.    Mr. Youssefzadeh and Mr. Javed Become Employees of GIP-Cayman and GIP-USA. ............................................................. 12

    F.    The Employee Proprietary Information Agreements. ........................ 14

    G.    Plaintiffs' Constructive Termination. ............................................ 14

    H.    Mr. Youssefzadeh's and Mr. Javed's Whistleblower Complaint. ....... 15

III.    ARGUMENT. ............................................................................. 17

    A.    GIP-USA Cannot Compel Arbitration. ......................................... 17

        1.    GIP-USA and Dong Yin Are Not Signatories to the SHA and Therefore Cannot Move to Compel Arbitration. ............... 17

        2.    GIP-USA's Agency and Estoppel Arguments Are Fatally Flawed. ...................................................................... 19

    B.    GIP-Cayman Cannot Compel Arbitration .................................... 21

        1.    Plaintiffs' Claims Do Not Arise From or Relate to the SHA. ....................................................................... 21

            a.    The Court Must First Determine if this Dispute is Within the Scope of the Arbitration Clause. ............. 21

2

244055.10

           b.     Courts Have Interpreted Arbitration Clauses that Purport to Apply to "Any Dispute" as Limited to Disputes Arising from or Connected to the Agreements in Which they are Contained. ..................22

     2.     Plaintiffs' Employment-Related Claims are Not Connected to the SHA. ..............................................25

 C.     The Parol Evidence Rule Bars Consideration of Section 13. .............26

     1.     Because the Employment Agreements are Fully Integrated Written Instruments, the Parol Evidence Rule Bars Evidence of the Arbitration Clause in the SHA. ..............26

           a.     Plaintiffs' Employment Agreements are Fully Integrated.......................................................27

     2.     Evidence of Section 13 of the SHA is Barred Under the Parol Evidence Rule Because it Would Directly Contradict the Employment Agreements. ................................27

     3.     Evidence of Section 13 is Also Barred Under the Parol Evidence Rule Because the Employment Agreements Were Intended as the Complete and Exclusive Statement of the Parties' Agreement. ..........................................29

 D.     If the Court Compels Arbitration Against GIP-Cayman, It Should Deny GIP's Request to Stay This Action as to GIP-USA and Dong Yin. ..................................................................................31

IV.    CONCLUSION ..............................................................................32

**OPPOSITION TO MOTION TO COMPEL ARBITRATION**

244055.10

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Federal Cases**

*Amisil Holdings Ltd. v. Clarium Capital Management,*
  622 F. Supp. 2d 825 (N.D. Cal. 2007)............................................................ 19, 20

*Anders v. Hometown Mortg. Servs., Inc.,*
  346 F.3d 1024 (11th Cir. 2003) ................................................................ 25

*Ashbey v. Archstone Property Mgmt., Inc.,*
  785 F.3d 1320 (9th Cir. 2015) ................................................................ 21

*AT&T Techs. v. Communs. Workers of Am.,*
  475 U.S. 643 (1986) ................................................................ 25

*Balen v. Holland America Line Inc.,*
  583 F.3d 647 (9th Cir. 2009).............................................................. 17, 21

*Black v. Richfield Oil Corp.,*
  41 F. Supp. 988 (S.D. Cal. 1941) ................................................................ 26

*CMAX, Inc. v. Hall,*
  300 F.2d 265 (9th Cir. 1962)............................................................. 31, 32

*Davis v. Cascade Tanks, LLC,*
  2014 WL 3695493 (D. Or. July 24, 2014) ................................................ 17

*Glencore Ltd. v. Degussa Engineered Carbons L.P.,*
  848 F. Supp. 2d 410 (S.D.N.Y. 2012) ................................................................ 18

*Infuturia Global Ltd. v. Sequus Pharamceuticals, Inc.,*
  163 F.3d 1133 (9th Cir. 2011) ................................................................ 18

*In re Jiffy Lube Intern., Inc., Text Spam Litig.,*
  847 F. Supp. 2d 1253 (S.D. Cal. 2012) ................................................ 23

*Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.,*
  186 F.3d 210 (2d Cir. 1999) ................................................................ 18

4

**OPPOSITION TO MOTION TO COMPEL ARBITRATION**

244055.10

*Kramer v. Toyota Motor Corp.,*
  705 F.3d 1122 (9th Cir. 2013) ..................................................................... 20

*Landis v. North American Co.,*
  299 U.S. 248 (1936) ...................................................................................... 31

*Liberty Nw. Ins. Co. v. Certain Underwriters at Lloyd's,*
  2015 WL 5012758 (N.D. Cal. Aug. 24, 2015) ...................................... 21

*Mitsubishi Motors Corp. v. Sole-Chrysler-Plymouth, Inc.,*
  473 U.S. 614 (2015) ............................................................................... 22, 25

*Mundi v. Union Sec. Life Ins. Co.,*
  555 F.3d 1042 (9th Cir. 2009) ........................................................... 19, 20

*Nken v. Holder,*
  556 U.S. 418 (2009) ...................................................................................... 31

*Operating Engineers v. Flair Builders, Inc.,*
  406 U.S. 487 (1972) ............................................................................... 24, 25

*Paracor Fin., Inc. v. Gen. Elec. Capital Corp.,*
  96 F.3d 1151 (9th Cir. 1996) ...................................................................... 26

*Ramirez-Baker v. Beazer Homes, Inc.,*
  636 F. Supp. 2d 1008 (E.D. Cal. 2008) .................................................. 30

*Reynoso v. Bayside Management Company LLC,*
  2013 WL 6173765 (N.D. Cal. Nov. 25, 2013) ...................................... 30

*Rutherford v. Palo Verde Health Care Dist.,*
  2014 WL 12637902 (C.D. Cal. Nov. 25, 2014) ................................... 26

*Ryan v. BuckleySandler, LLP,*
  69 F. Supp. 3d 140 (D.D.C. 2014) ........................................................... 30

*Simula Inc. v. Autoliv, Inc.,*
  175 F.3d 716 (9th Cir. 1999) ............................................................... 22, 25

*Smith v. Steinkamp,*
  318 F.3d 775 (7th Cir. 2003) ............................................................... 22, 23

*Snyder v. Dietz & Watson, Inc.,*
  837 F. Supp. 2d 428 (D.N.J. 2011) ......................................................... 24

5

**OPPOSITION TO MOTION TO COMPEL ARBITRATION**

244055.10

*Standard Bent Glass Corp. v. Glassrobots Oy*,
   333 F.3d 440 (3d Cir. 2003) ................................................................. 18

*Vedachalam v. Tata Am. Int'l Corp.*,
   477 F. Supp. 2d 1080 (N.D. Cal. 2007), *aff'd*, 339 F. App'x 761 (9th
   Cir. 2009) ...................................................................... 21, 23, 24

*Wexler v. AT & T Corp.*,
   211 F. Supp. 3d 500 (E.D.N.Y. Sep. 30, 2016) .......................................... 22, 23

*Yang v. Majestic Blue Fisheries, LLC*,
   876 F.3d 996 (9th Cir. 2017) ............................................... 8, 18, 19, 31

**California Cases**

*Apex LLC v. Sharing World, Inc.*,
   206 Cal. App. 4th 999 (2012) .................................................................. 28

*Banco Do Brasil, S.A. v. Latian, Inc.*,
   234 Cal. App. 3d 973 (1991), *overruled on other grounds*,
   *Riversiland Cold Storage, Inc. v. Fresno-Madera Production Credit
   Association*, 55 Cal. 4th 1169 (2013) .......................................... 27, 28

*Brawthen v. H&R Block, Inc.*,
   28 Cal. App. 3d 131 (1972) .................................................................... 29

*Burch v. Premier Homes, LLC*,
   199 Cal. App. 4th 730 (2011) ................................................................. 27

*Grey v. American Management Services*,
   204 Cal.App.4th 803 (2012) .................................................................. 29

*Masterson v. Sine*,
   68 Cal. 2d 222 (1968) ................................................................. 26, 27

*Mobile Oil Corp. v. Handley*,
   76 Cal. App. 3d 956 (1978) .................................................................... 28

*Singh v. Southland Stone*,
   186 Cal.App.4th 338 (2010) ................................................................. 28

**Federal Statutes**

9 U.S.C. § 208 ........................................................................................... 19

6

**OPPOSITION TO MOTION TO COMPEL ARBITRATION**

22 U.S.C. § 2778 ........................................................................................ 14

50 U.S. C. § 4610 ...................................................................................... 14

**California Statutes**

Cal. Code Civ. Proc. § 1856(a) ............................................................ 26, 29

Cal. Code Civ. Proc. § § 1856(b) ............................................................. 29

**Other Authorities**

15 C.F.R. § 742.4(b)(1)(iii) ...................................................................... 14

22 C.F.R. § 120.17(c) .............................................................................. 14

## **MEMORANDUM OF POINTS AND AUTHORITIES**

Plaintiffs Emil Youssefzadeh and Umar Javed (collectively, "Plaintiffs") submit this Opposition to the Motion to Compel Arbitration and Stay Judicial Proceedings ("Motion") filed by Defendants Global-IP Cayman, Inc. ("GIP-Cayman") and Global-IP USA, Inc.'s ("GIP-USA") (collectively, "GIP").

## I.    INTRODUCTION.

**A.    This Court Lacks Jurisdiction to Compel Arbitration as to GIP-USA.**

The Motion is easily resolved as to defendant GIP-USA. *Yang v. Majestic Blue Fisheries, LLC*, 876 F.3d 996, 999 (9th Cir. 2017) holds that the Court only has jurisdiction to order an international arbitration as to parties and signatories to the arbitration agreement. GIP-USA is neither a party nor a signatory to either the Shareholders Agreement ("SHA") or the Share Purchase Agreement ("SPA"). In fact, it did not even exist when the SHA and SPA were signed. The Court therefore lacks jurisdiction to order Plaintiffs' claims against GIP-USA to arbitration.

Furthermore, GIP's claim that GIP-USA may enforce the arbitration agreement as a nonsignatory on agency or equitable estoppel grounds ignores the Court's lack of jurisdiction, is contrary to controlling Ninth Circuit law and was rejected by the very cases cited by GIP.

**B.    The Court Should Not Compel Arbitration as to GIP-Cayman.**

GIP-Cayman's attempt to compel arbitration should also be denied. The Motion fails because the Dispute Resolution provisions of the SHA and SPA do not apply to this employment dispute. In addition, GIP-Cayman's reliance on the SHA and SPA is prohibited by the parol evidence rule.[1]

### *1.    The Arbitration Agreement Does Not Apply to This Dispute.*

The "Governing Law and Dispute Resolution" provision set forth in section 13

---

[1] These arguments apply with equal force to GIP-USA. Accordingly, the Court should deny arbitration as to GIP-USA even if it concludes that it has jurisdiction to order GIP-USA to arbitration notwithstanding *Yang*.

of the SHA (hereinafter "Section 13") and the parallel provision in the SPA, provides that "any disputes" must be arbitrated before a three arbitrator panel of the Hong Kong International Arbitration Centre ("HKIAC").  Courts construing similarly broad provisions have uniformly held that such provisions must be interpreted as applying only to disputes arising out of the contracts containing the arbitration provisions and the legal relationships that those contracts create.  This dispute does not arise out of the SHA or the SPA or the legal relationships they create.  Neither the SHA nor the SPA provides that Plaintiffs shall be employees of GIP-Cayman.

Furthermore, it is quite clear that the parties never intended for Section 13 to apply to this employment dispute because:  (a) Section 13 provides that one of the arbitrators should be selected by Bronzelink Holdings Limited ("Bronzelink"), which is not a party to the employment agreements that each Plaintiff entered into with GIP-Cayman and GIP-USA (collectively, the "Employment Agreements"); (b) Section 13 provides for arbitration in Hong King, but GIP-Cayman is not a Hong Kong corporation and does not have offices or conduct operations in Hong Kong; moreover, Plaintiffs are California residents; (c) the Employment Agreements specifically provide that California law applies, which is directly contrary to Section 13 and would make no sense if the parties contemplated arbitration in Hong Kong, and (d) prior to entering into the Employment Agreements, Plaintiffs had performed services for GIP-Cayman pursuant to Advisory Agreements which specified that California law applied and that California Courts had jurisdiction to resolve any disputes involving those agreements.

### 2. *The Parol Evidence Rule Bars GIP From Relying on the SHA and the SPA.*

The Employment Agreements signed by Plaintiffs are integrated contracts "superseding in all respects any and all prior oral or written agreements or understandings pertaining to the employment of the Employee."  They do not provide for arbitration and they contain a California choice of law provision that

9

**OPPOSITION TO MOTION TO COMPEL ARBITRATION**

directly contradicts Section 13, which provides that the laws of England and Wales apply. Because Section 13 directly contradicts the Employment Agreements, it is inadmissible under the parol evidence rule. Furthermore, because Plaintiffs' Employment Agreements were intended as the complete and exclusive statement of the terms of the parties' employment relationships, their terms may not be explained or supplemented by the SHA or SPA. Finally, the parties never intended that a dispute arising under the Employment Agreements be arbitrated before an arbitration panel in Hong Kong.

For all of these reasons, GIP's Motion should be denied.

## II.   STATEMENT OF FACTS

**A.   The Satellite Project.**

In 2008, Plaintiffs began a project to design, build, launch and operate a state-of-the-art communications satellite to provide High Speed Internet Access ("HSIA") to under-served parts of sub-Saharan Africa (the "Satellite Project"). Declaration of Umar Javed ("U.J. Decl."), ¶¶ 2-6; Declaration of Emil Youssefzadeh ("E.Y. Decl."), ¶¶ 2-5.) In April 2013, they formed GIP-Cayman as the entity that would own and operate the satellite.

**B.   The June 2016 Transaction.**

To raise the first tranche of financing for the Satellite Project, in June 2016 the GIP-Cayman shareholders sold a majority interest in GIP-Cayman to Bronzelink pursuant to the SHA and SPA. (U.J. Decl., ¶¶ 10-13; E.Y. Decl., ¶ 9-11; Exhs. 1 and 2.) Bronzelink acquired Series A stock in GIP-Cayman, giving it a 75% interest in GIP-Cayman and the right to appoint six members to the nine-member GIP-Cayman Board of Directors. The remaining 25% ownership interest in GIP-Cayman was held by STM Atlantic, an entity controlled by Mr. Youssefzadeh; Steadyspace Limited, an entity owned by Bahram Pourmand; and Mr. Javed (collectively, the "Common Holders"), with STM Atlantic owning a controlling interest in the common stock and the right to appoint three members to the Board.

(U.J. Decl., ¶¶ 9, 12; E.Y. Decl., ¶¶ 8, 11)

Section 13 of the SHA contains a choice of law provision which provides that the laws of England and Wales apply.  Section 13 further provides that "any dispute" shall be resolved through arbitration in Hong Kong administered by the HKIAC.  Section 13 provides for a three arbitrator panel, with Bronzelink and the Common Holders each nominating one arbitrator, who then nominate the third arbitrator."  SHA, § 13.  Neither the SHA nor the SPA provides that Mr. Youssefzadeh or Mr. Javed will be employed by GIP-Cayman or sets forth the terms of any such employment.  (*See* Exhs. 1 and 2.)

The SHA provides that any dispute between Bronzelink and the Common Holders would be governed by the laws of England and Wales in an arbitration in Hong Kong, where Bronzelink is headquartered.[2]  [Declaration of Yeun Cheung Wong, ¶ 2 (Dkt. No. 20-4].  None of the parties to the June 3, 2016 transaction was incorporated, resided or did business in England or Wales.  Mr. Youssefzadeh and Mr. Javed agreed to the "Governing Law" provision because they understood that tribunals in Hong Kong frequently apply English law, since Hong Kong is a former British colony.  (U.J. Decl., ¶ 22; E.Y. Decl., ¶ 17.)

Dong Yin provided the financing to Bronzelink for the June 3, 2016 transaction.  Dong Yin is a wholly owned subsidiary of China Orient Asset Management Co., Ltd., which is an agency or instrumentality of the People's Republic of China.  Dong Yin's role in the transaction was meant to be limited to providing debt financing to Bronzelink.  Dong Yin was not a signatory to either the SPA or the SHA, and has no rights or responsibilities under either of those agreements.  (U.J. Decl., ¶ 14.)

---

[2] Section 8 of the SPA contains an identical "Governing Law and Dispute Resolution" provision, except the second clause substitutes "Bronzelink" and "[t]he GIP Team" for the "Series A Holder" and the "Common Holders," respectively.  *See* SPA, § 8.2.  Because the SHA and SPA have virtually identical Governing Law and Dispute Resolution provisions, this Opposition will simply refer to the SHA, unless otherwise noted.

**OPPOSITION TO MOTION TO COMPEL ARBITRATION**

244055.10

**C.     Mr. Youssefzadeh and Mr. Javed Become Consultants.**

Shortly after the June 3, 2016 transaction closed, Pourmand became GIP-Cayman's Chief Executive Officer ("CEO").  (U.J. Decl., ¶ 25; E.Y. Decl., ¶ 20.)  To support Pourmand in that role, Mr. Youssefzadeh and Mr. Javed were asked and agreed to enter into Executive Advisory Agreements (collectively, the "Advisory Agreements") with GIP-Cayman.  Under those agreements, each of them committed to provide advisory services on a part-time basis to GIP-Cayman in return for a fixed monthly fee.  (U.J. Decl., ¶ 25; E.Y. Decl., ¶ 20; Exhs. 3, 12.)

The Advisory Agreements provided that California law, rather than the law of England and Wales, applied and eschewed arbitration in favor of the "courts of California."  (U.J. Decl., ¶ 26; E.Y. Decl., ¶ 21; Exhs. 3 and 12.)

At the time they entered into the Advisory Agreements, Mr. Youssefzadeh and Mr. Javed also entered into Non-Disclosure Agreements ("NDAs").  (U.J. Decl., ¶ 27; E.Y. Decl., ¶ 22; Exhs. 4 and 13.)  Like the Advisory Agreements, the NDAs provide that California law applies and that the parties consented and submitted to "the exclusive jurisdiction of the court in California," with venue lying in Los Angeles, California.

**D.     GIP-USA is Incorporated in August 2016.**

GIP-USA was formed to be the U.S. operating company for the Satellite Project.  GIP-USA was incorporated in August 2016, two months after STM Atlantic and Mr. Javed entered into the SHA and SPA.  Needless to say, it was not a party or signatory to the SHA or the SPA.  Moreover, neither the SPA nor the SHA required GIP-Cayman to create GIP-USA and neither agreement was amended to add GIP-USA as a party.

**E.     Mr. Youssefzadeh and Mr. Javed Become Employees of GIP-Cayman**
**        and GIP-USA.**

On September 28, 2016, Pourmand's employment agreement with GIP-Cayman was amended to strip him of his CEO duties and authority.

1   Mr. Youssefzadeh assumed those duties and authority for both GIP-Cayman and

2   GIP-USA.  (U.J. Decl., ¶¶ 30-31; E.Y. Decl., ¶ 25; Exhs. 6 and 7.)

3       Effective October 1, 2016, Mr. Youssefzadeh and Mr. Javed entered into

4   separate Employment Agreements with GIP-Cayman and GIP-USA.  Pursuant to

5   those Employment Agreements, Mr. Youssefzadeh became the Chief Technology

6   Officer of GIP-Cayman and GIP-USA, and Mr. Javed became the President and

7   Chief Operating Officer of GIP-Cayman and GIP-USA.  (Exhs. 6, 7-14 and 15.)

8   Bronzelink was not a party to any of the Employment Agreements.

9       Each of the Employment Agreements provided that:

10      This Agreement contains the entire agreement between the parties,
        superseding in all respects any and all prior oral or written agreements

11      or understandings pertaining to the employment of the Employee by the
        Company and shall be amended or modified only by written instrument

12      signed by both of the parties hereto.

13  (Exhs. 8, 9, 14 and 15.)

14      As this language demonstrates, the parties did not intend that the Employment

15  Agreements would be supplemented by the terms of any prior agreements, including

16  the SHA, the SPA, the NDAs, or the Advisory Agreements.  (U.J. Decl., ¶ 40;

17  E.Y. Decl., ¶ 32)  Nor did the parties intend that an employment dispute would be

18  arbitrated in Hong Kong, under the law of England and Wales.  To the contrary, each

19  agreement provided that "[t]he laws of the State of California shall govern this

20  Agreement."  (U.J. Decl., ¶¶ 39-41; E.Y. Decl., ¶ 32-34; Exhs. 8, 9, 14 and 15.)

21      Mr. Youssefzadeh and Mr. Javed never understood their Employment

22  Agreements to be related to the SHA or SPA, much less governed by Section 13.

23  Just the opposite; they negotiated and understood them to be separate, stand alone

24  and self-contained agreements, and that if there was a dispute involving their

25  employment, it would be resolved in the California courts and not through arbitration

26  in Hong Kong.  (U.J. Decl., ¶ 40; E.Y. Decl., ¶ 32.)

27      Moreover, their understanding was perfectly reasonable.  *First*, they lived and

28  worked in California.  *Second*, neither the SHA or SPA provided for or otherwise

1  concerned their employment by GIP.  *Third*, GIP-USA did not even exist at the time
2  the SHA and SPA were executed.  *Fourth*, their Employment Agreements were
3  removed in time from the preparation and execution of the SHA and SPA.  *Fifth*,
4  each of those agreements provided that California law and not the law of England
5  and Wales would govern, made no mention of arbitration and stated that their
6  provisions superseded those of any and all prior agreements pertaining to their
7  employment.  And *sixth*, the predecessor independent consulting contracts specified
8  that the California courts had jurisdiction to resolve any dispute involving those
9  agreements.

10  **F.     The Employee Proprietary Information Agreements.**

11          Because the Employment Agreements superseded the NDAs, when Plaintiffs
12  entered into the Employment Agreements, they each entered into Employee
13  Proprietary Information Agreements ("EPIAs") with GIP-Cayman and
14  GIP-USA, which purported to prohibit the disclosure of confidential company
15  information.  Like the Employment Agreements, the EPIAs are fully integrated
16  contracts that are expressly governed by California law.  (U.J. Decl., ¶ 43;
17  E.Y. Decl., ¶ 35; Exhs.10 and 16.)

18  **G.     Plaintiffs' Constructive Termination.**

19          By early 2017, Plaintiffs had become gravely concerned that Dong Yin, which
20  was supposed to be only the lender to Bronzelink in connection with the Satellite
21  Project, was actually exercising control over the governance, management and
22  operations of GIP-Cayman and GIP-USA, in violation of the International Traffic in
23  Arms Regulations ("ITAR") and the Export Administration Regulations ("EAR").
24  This conduct was especially concerning because the willful violation of ITAR and
25  EAR is a criminal offense.  22 U.S.C. § 2778; 50 U.S. C. § 4610.[3]

26  _____

27  [3] ITAR and EAR each contain a PRC Prescription under which the People's
    Republic of China is an embargoed nation prohibited from technology and data
28  subject to those regulations.  22 C.F.R. § 120.17(c) and 15 C.F.R. § 742.4(b)(1)(iii).

1      In May and June 2017, Mr. Youssefzadeh and Mr. Javed made multiple

2  requests to the GIP-Cayman Board to convene a meeting to address their concerns

3  about compliance with the export control laws.  (U.J. Decl., ¶46; E.Y. Decl., ¶ 38.)

4  Not only did the Board refuse to meet, but Mr. Youssefzadeh and Mr. Javed were

5  told that they could not continue as employees of GIP-Cayman or GIP-USA if they

6  wished to remain on the GIP-Cayman Board of Directors.  *Id.*[4]

7      On June 22, 2017, Yuen Cheung (Tony") Wong, a member of the

8  GIP-Cayman Board of Directors, noticed a board meeting for June 29, 2017 and

9  placed on the agenda whether to "accept" the resignations of Mr. Youssefzadeh and

10  Mr. Javed, even though neither of them had resignations pending at that time.

11  (U.J. Decl., ¶49; E.Y. Decl., ¶ 41.)

12      On June 26, 2017, Mr. Youssefzadeh and Mr. Javed resigned from their

13  positions as executives of GIP-Cayman and GIP-USA, based on their concerns that

14  GIP was in violation of U.S. export control laws and their unwillingness to

15  knowingly participate in such violations.  (U.J. Decl., ¶50; E.Y. Decl., ¶ 42.)

16  **H.     Mr. Youssefzadeh's and Mr. Javed's Whistleblower Complaint.**

17      On February 23, 2017, Plaintiffs filed this action in the Los Angeles County

18  Superior Court.  Plaintiffs' Complaint alleged 21 causes of action, each of which

19  arose out of Plaintiffs' employment with, and constructive termination by,

20  GIP-Cayman and GIP-USA.  Specifically, Plaintiffs each brought separate causes of

21  action against GIP-Cayman and GIP-USA for:  Retaliation in Violation of Labor

22  Code Section 1102.5(b), (c) (First through Eighth Causes of Action) (Complaint,

23  ¶¶ 89-148); Constructive Wrongful Discharge in Violation of Public Policy (Ninth

24  through Twelfth Causes of Action) (Complaint, ¶¶ 149-180); Breach of Contract

25  (Thirteenth through Sixteenth Causes of Action) (Complaint, ¶¶ 181-212); and

26  

---

[4] On June 4, 2017, the Common Holders, including Pourmand, sent a Notice of
27  Breach to Bronzelink, identifying breaches of the SHA by Bronzelink.  The Notice
of Breach was ***not*** sent to GIP-Cayman or GIP-USA, and did not raise any
28  employment issues.  (U.J. Decl., ¶¶ 47-48; E.Y. Decl., ¶ 39-40; Exh. 11.)

**OPPOSITION TO MOTION TO COMPEL ARBITRATION**

1   Breach of the Implied Covenant of Good Faith and Fair Dealing (Seventeenth

2   through Twentieth Causes of Action) (Complaint, ¶¶ 213-237).  In addition,

3   Mr. Youssefzadeh and Mr. Javed jointly alleged a single cause of action against

4   Dong Yin for Intentional Interference with Contractual Relations (Twenty-First

5   Cause of Action) (Complaint, ¶¶ 238-245).

6        Neither the SPA nor the SHA is referenced in the Complaint because neither

7   has any relevance to this dispute.  Plaintiffs have not brought any claims based on or

8   arising out of the SHA or SPA; they have not sued for breach of either the SHA or

9   the SPA; and they have not sued any members of the GIP-Cayman or GIP-USA

10  Boards for violating their contractual or fiduciary duties.  Moreover, Bronzelink is

11  not named as a defendant and is not a party to this dispute; nor are any

12  Bronzelink-appointed directors.

13       Contrary to GIP's assertions, this is not a "shareholder dispute" that hinges on

14  whether the Series A shareholders complied with their obligations under the SHA.

15  *See* Motion, pp. 8-9.  It is an employment action brought by two former executives

16  who were retaliated against and constructively terminated by GIP-Cayman and

17  GIP-USA, in violation of California statutory laws that protect whistleblowers such

18  as Mr. Youssefzadeh and Mr. Javed.

19       GIP argues that the Complaint "touches upon" the SPA and the SHA because

20  "Plaintiffs allegedly sought to raise [compliance issues] at noticed board meetings,

21  but claim that each time the Series A Directors did not attend and thus defeated a

22  quorum."  Motion, p. 14.  These allegations are relevant to the Whistleblower Action

23  because they explain why Plaintiffs had to resign in order to avoid being knowing

24  participants in criminal conduct, not because they establish a breach of the SHA or

25  the SPA.

26       Similarly, GIP argues that Plaintiffs have alleged that "the Series A Directors'

27  refusal to appear at GIP Board meetings noticed by Plaintiffs prevented the GIP

28  Board from considering a financing proposal that Plaintiffs wanted GIP to accept."

16

**OPPOSITION TO MOTION TO COMPEL ARBITRATION**

244055.10

Motion, p. 15.  These allegations were not included to allege a breach of the SHA or the SPA, but rather to support Plaintiffs' claims of breach of the implied covenant of good faith and fair dealing because the Employment Agreements provide that Plaintiffs' compensation would increase when financing is obtained, and Plaintiffs were denied this contractual benefit.  S*ee* Complaint, ¶¶ 50-51; 56-57; 215-217; 221-223; 227-229; 233-235; 241-242.

### III.   ARGUMENT.

#### A.   GIP-USA Cannot Compel Arbitration.

##### 1.   *GIP-USA and Dong Yin Are Not Signatories to the SHA and Therefore Cannot Move to Compel Arbitration.*

As GIP acknowledged in its Motion, international arbitrations are governed by Chapter 2 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 201, *et seq.*, which codifies the Convention.  Motion, pp. 17-19.  GIP's Motion fails right out of the blocks as to GIP-USA because neither it nor Dong Yin a signatory to the SPA or SHA; this Court therefore lacks subject matter jurisdiction as to those parties under the Convention.[5]

Under the FAA's section 206, a district court can only compel arbitration outside the United States if the jurisdictional requirements of the Convention are met.  To establish jurisdiction, a party seeking to compel arbitration must prove the existence and validity of "an agreement **in writing within the meaning of the Convention**."  *See Balen v. Holland America Line Inc.*, 583 F.3d 647, 654-55 (9th Cir. 2009) (emphasis added); *Davis v. Cascade Tanks, LLC*, 2014 WL 3695493, at *6 (D. Or. July 24, 2014) (court must determine whether jurisdiction is established before considering the substantive enforceability of the agreement).  Furthermore, only a party and signatory to the arbitration agreement can satisfy the jurisdictional

---

[5] Dong Yin is not a party to the Motion, but Plaintiffs have included it in this discussion because the law precluding nonparties and nonsignatories from compelling an international arbitration applies with equal force to it.

**OPPOSITION TO MOTION TO COMPEL ARBITRATION**

1    requirements of the Convention.  *See Yang*, 876 F.3d at 999-1001. [6]

2         The Ninth Circuit opinion in *Yang*, which is not even cited in GIP's Motion,

3    controls.  *Yang* was a wrongful death action in which the decedent had entered into

4    an arbitration agreement with his employer, Majestic.  The plaintiff also named a

5    related party, Dongwon, which was not a signatory to the arbitration agreement.

6    *Yang*, 876 F.3d at 998.  Both defendants brought a motion to compel arbitration

7    under the Convention.  The district court compelled arbitration on the claims against

8    Majestic, but denied the motion as to Dongwon, on the grounds that it was neither a

9    signatory nor a party to the employment agreement.  *Id.*  The Ninth Circuit affirmed,

10    stating:

> The Convention Treaty contemplates that only a "party" or "parties to
> the agreement referred to in article II" may litigate its enforcement.
> Convention Treaty, art. IV(1), V(1)(a), VI.  Indeed, Article II makes
> clear that arbitration is permissible only where there is "an agreement in
> writing under which the parties undertake to submit to arbitration all or
> any differences which have arisen or which may arise between
> *them*" - not disputes between a party and a non-party.  Dongwon has
> therefore failed to satisfy not only the "signed by the parties"
> requirement . . . but also the more basic requirement that a litigant be a
> "party" to the agreement under which it moves to compel.  **Because the
> Convention Treaty does not allow non-signatories or non-parties to
> compel arbitration, Dongwon cannot do so here.**

18    *Id.* at 1001 (citations omitted, emphasis added).[7]

---

[6] Removal jurisdiction is broader.  Just as a federal cause of action need not
ultimately prove meritorious to confer federal subject matter jurisdiction, so too an
arbitration agreement need not ultimately be found subject to the Convention to
confer removal jurisdiction.  *See Infuturia Global Ltd. v. Sequus Pharamceuticals,
Inc.*, 163 F.3d 1133, 1138 (9th Cir. 2011) ("[W]henever an arbitration agreement
could *conceivably* affect the outcome of plaintiff's case, the agreement relates to the
plaintiff's suit.") (emphasis in original, internal quotation marks omitted).

[7] *See also Kahn Lucas Lancaster, Inc. v. Lark Int'l Ltd.*, 186 F.3d 210, 215
(2d Cir. 1999) ("[T]he definition of 'agreement in writing' in the Convention
requires that such an agreement, whether it be an arbitration agreement or an arbitral
clause in a contract, be signed by the parties or contained in a series of letters or
telegrams."); *Standard Bent Glass Corp. v. Glassrobots Oy*, 333 F.3d 440, 449
(3d Cir. 2003) (concluding that drafters intended to "apply the
signature . . . requirements to both an arbitral clause within a contract or a separate
arbitration agreement"); *Glencore Ltd. v. Degussa Engineered Carbons L.P.*, 848 F.
Supp. 2d 410, 423 (S.D.N.Y. 2012) ("[I]n a non-domestic case, to accord with the

**OPPOSITION TO MOTION TO COMPEL ARBITRATION**

244055.10

Here, GIP-Cayman is the only defendant who can satisfy this threshold jurisdictional requirement because neither GIP-USA nor Dong Yin is a party to, or a signatory of, the SHA.

### 2.   GIP-USA's Agency and Estoppel Arguments Are Fatally Flawed.

GIP argues that, even though GIP-USA is a nonsignatory, it can compel arbitration based on state law principles of agency and equitable estoppel.  Motion, p. 24.  Once again, GIP ignores *Yang*, which considered and expressly rejected these very arguments:

> Dongwon urges us to circumvent the [Convention's] requirements by importing into our [Convention] analysis precedent permitting a litigant who is not a party to an arbitration agreement to invoke arbitration *under the FAA* if the relevant state contract law allows the litigant to enforce the agreement.
>
> We reject this doctrinal sleight of hand because the [Convention] and the FAA impose conflicting requirements on a litigant seeking to compel arbitration.  While the FAA permits arbitration where an arbitration agreement is enforceable under state law, the [Convention] requires a litigant to satisfy additional prerequisites established by the Convention Treaty.  One such prerequisite is that the litigant prove the agreement is in writing and "signed by the parties."  Convention Treaty, art. II(2).  Another is that the dispute at issue be one between the "parties."  Convention Treaty, art. II(1).  To the extent the FAA provides for arbitration of disputes with non-signatories or non-parties, it conflicts with the Convention Treaty and therefore does not apply.  9 U.S.C. § 208.  Accordingly, cases interpreting the FAA as allowing a non-signatory or non-party to compel arbitration where an arbitration agreement is enforceable under state law offer no guidance in interpreting the [Convention's] requirement that an agreement in writing be signed by the parties.

876 F.3d at 1002 (emphasis in original; citations and internal quotation marks omitted).

GIP cites *Mundi v. Union Sec. Life Ins. Co.*, 555 F.3d 1042, 1046 (9th Cir. 2009), and *Amisil Holdings Ltd. v. Clarium Capital Management*, 622 F. Supp. 2d 825 (N.D. Cal. 2007) in support of its agency and estoppel

---

standards set by the [Convention], the prevailing theory of contract formation must also entail an agreement or an arbitral clause that is either 'signed by the parties' or 'contained in an exchange of letters or telegrams.'") (citation omitted).

19

**OPPOSITION TO MOTION TO COMPEL ARBITRATION**

1   arguments.  Motion, pp. 24-25.  But neither of those cases involved an international

2   arbitration agreement or discussed the jurisdictional requirements of the Convention.

3   For this reason alone, neither case is applicable here.

4        Furthermore, in *Mundi* the Ninth Circuit *rejected* the defendant's equitable

5   estoppel argument, stating that there were only "two types of equitable estoppel in

6   the arbitration context":

> In the first, a nonsignatory may be held to an arbitration clause where
> the nonsignatory knowingly exploits the agreement containing the
> arbitration clause despite having never signed the agreement.  Under the
> second, a signatory may be required to arbitrate a claim brought by a
> nonsignatory because of the close relationship between the entities
> involved, as well as the relationship of the alleged wrongs to the non-
> signatory's obligations and duties in the contract and the fact that the
> claims were intertwined with the underlying contractual obligations.

12  *Id.* at 1045-46 (citations and internal quotation marks omitted).

13       Similarly, *Amisil* holds that, in the case of domestic arbitration agreements,

14  a nonsignatory agent can only compel arbitration if the claims against that agent

15  "arise out of or relate to the contract containing the arbitration clause."  622 F. Supp.

16  2d at 832.

17       In this case, GIP-USA does not have any obligations or duties under the SHA

18  and has not been sued under the SHA.  Plaintiffs' claims against GIP-USA arise out

19  of their employment contracts with GIP-USA; no other agreements.  Furthermore,

20  Plaintiffs are not alleging that GIP-USA is liable as GIP-Cayman's agent; rather,

21  they are seeking to hold GIP-USA directly liable for its own employment

22  relationship with Plaintiffs.[8]

23       In short, under *Mundi* and *Amisil*, GIP-USA cannot compel arbitration under

24  equitable estoppel or agency principles, even if it could satisfy the threshold

25  jurisdictional requirement – which, as explained above, it cannot.

26

27  _____
    [8] The "public policy in favor of arbitration does not extend to those who are not
    parties to an arbitration agreement."  *Kramer v. Toyota Motor Corp.*, 705 F.3d 1122,
28  1126 (9th Cir. 2013) (internal quotation marks omitted).

**B.     GIP-Cayman Cannot Compel Arbitration**

    *1.    Plaintiffs' Claims Do Not Arise From or Relate to the SHA.*

        a.    <u>The Court Must First Determine if this Dispute is Within the Scope of the Arbitration Clause.</u>

In *Balen v. Holland America Line Inc.*, 583 F.3d 647 (9th Cir. 2009), the Ninth Circuit set forth a four-factor test for determining whether an international arbitration agreement is enforceable under the Convention:

> (1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states.

*Id.*, at 654-55.  GIP argues that if the arbitration provision satisfies this test, then the Court must compel arbitration if it finds that "Plaintiffs' factual allegations 'touch matters' covered by an agreement to arbitrate."  Motion, p. 20.  GIP misstates the law.

The law is clear:  if the *Balen* requirements are met, GIP then has the burden of showing that the dispute falls within the scope of the arbitration provision; it cannot compel arbitration unless it meets that burden.  *See Ashbey v. Archstone Property Mgmt., Inc.*, 785 F.3d 1320, 1323 (9th Cir. 2015) ("[The] party seeking to compel arbitration has the burden of showing, (1) the existence of a valid, written agreement to arbitrate; and, if it exists, (2) that the agreement to arbitrate encompasses the dispute at issue."); *Vedachalam v. Tata Am. Int'l Corp.*, 477 F. Supp. 2d 1080, 1087 (N.D. Cal. 2007) (Under the Convention, "the court must determine whether the claims stated in the complaint are within the scope of the legal relationship defined in the [arbitration] agreement."), *aff'd*, 339 F. App'x 761 (9th Cir. 2009); *Liberty Nw. Ins. Co. v. Certain Underwriters at Lloyd's*, 2015 WL 5012758, at *2 (N.D. Cal. Aug. 24, 2015) ("Since the operative complaint does not raise claims that relate to an arbitration agreement or award falling under the

21

**OPPOSITION TO MOTION TO COMPEL ARBITRATION**

1  Convention, section 205 is not triggered.").

2      The cases GIP cites – *Mitsubishi Motors Corp. v. Sole-Chrysler-Plymouth,*

3  *Inc.*, 473 U.S. 614 (2015), and *Simula Inc. v. Autoliv, Inc.*, 175 F.3d 716

4  (9th Cir. 1999) – do not state a different rule.  In *Mitsubishi Motor Corp.*, the

5  Supreme Court stated that "the first task of a court asked to compel arbitration of a

6  dispute is to determine whether the parties agreed to arbitrate that dispute."  473 U.S.

7  at 626.   *Simula* "present[ed] the question of how broadly an arbitration clause

8  containing the phrase 'arising in connection with this Agreement' should be

9  construed."  175 F.3d at 718.  The Ninth Circuit held that although the language

10  should be construed broadly, it was still limited to a "dispute between the parties

11  having *a significant relationship* to the contract and all disputes having their *origin*

12  *or genesis* in the contract."  *Id.* at 721 (emphasis added).

13      b.    Courts Have Interpreted Arbitration Clauses that Purport to

14            Apply to "Any Dispute" as Limited to Disputes Arising from or

15            Connected to the Agreements in Which they are Contained.

16      Section 13 of the SHA provides that "any dispute" shall be resolved through

17  final and binding arbitration."  SHA, § 13.2 (emphasis added).  Such "strikingly

18  broad" arbitration clauses are rare.  *Wexler v. AT & T Corp.*, 211 F. Supp. 3d 500,

19  502 (E.D.N.Y. Sep. 30, 2016).  Courts that have addressed such clauses have

20  uniformly interpreted them to be limited to disputes arising out of, or related to, the

21  underlying contract containing the arbitration clause.  Under these cases, this

22  employment dispute is far outside the scope of Section 13.

23      In *Smith v. Steinkamp*, 318 F.3d 775 (7th Cir. 2003), borrowers signed an

24  arbitration agreement in connection with an initial loan, which purportedly applied to

25  "all claims asserted by you . . . against us."  *Id.* at 776.  The Seventh Circuit

26  recognized the "absurd results" that would ensue if the arbitration provision were

27  interpreted literally, offering the following examples: "[I]f [defendant] murdered

28  [plaintiff] . . . and her survivors brought a wrongful death suit against

22

**OPPOSITION TO MOTION TO COMPEL ARBITRATION**

1  [defendant] . . ., [defendant] could insist that the wrongful death claim be submitted

2  to arbitration.  [Or] if an employee of [defendant] picked [plaintiff's] pocket . . ., and

3  [plaintiff] sued the employee for conversion, he would be entitled to arbitration of

4  her claim." *Id.* at 777.  To avoid such "absurd results," the court held that the

5  arbitration agreement was inapplicable to disputes arising from subsequent loans for

6  which the borrowers had not signed an arbitration agreement.  *Id.* at 778.

7       In *In re Jiffy Lube Intern., Inc., Text Spam Litig.*, 847 F. Supp. 2d 1253

8  (S.D. Cal. 2012), the arbitration clause purported to apply to "any and all disputes"

9  between the parties.  *Id.* at 1262.  The court held that the agreement could not "truly

10  encompass 'any and all disputes between the parties,'" such as "a tort action arising

11  from a completely separate incident." *Id.* at 1263.  The court therefore analyzed

12  whether the dispute "ar[o]se out of or relate[d] to the contract," and held that the

13  arbitration clause did not encompass the claims at issue.  *Id.*

14       Likewise, in *Wexler*, 211 F. Supp. 3d at 502, the court concluded that there

15  would be "absurd results" if an arbitration provision – in which the plaintiff had

16  agreed "to arbitrate all disputes and claims between us" – were "not limited to

17  disputes concerning [the] agreement" in which it was contained.  211 F. Supp. 3d at

18  502.  The court concluded that, "[n]otwithstanding the literal meaning of the clause's

19  language," a "reasonable person would be expressing, at most, an intent to agree to

20  arbitrate disputes connected in some way to the [agreement]," and denied arbitration.

21  *Id.* at 502, 505.

22       In *Vedachalam*, an arbitration clause in an employee training agreement

23  purportedly applied to "any claim of liability."  477 F. Supp. 2d at 1087.  The court

24  rejected defendant's argument that plaintiff's employment claims were subject to

25  arbitration under the Convention.  Noting that the "relationship defined by

26  the . . . training agreement is primarily that of trainer and trainee," the court

27  concluded that "it is simply too much of a stretch" to hold the plaintiff's employment

28  claims subject to arbitration where they were not "in respect of" the training

**OPPOSITION TO MOTION TO COMPEL ARBITRATION**

1  agreement.  *Id.*

2  *Snyder v. Dietz & Watson, Inc.*, 837 F. Supp. 2d 428 (D.N.J. 2011), was an

3  employment action in which the employer moved to arbitrate claims pursuant to a

4  collective bargaining agreement ("CBA") with the plaintiff's union.  The CBA

5  required arbitration of "all grievances, complaints, differences and disputes."

6  *Id.* at 439.  The court refused to construe the CBA's arbitration clause to mandate

7  arbitration of the plaintiff's claims that existed independent of the rights conferred by

8  the CBA:

9      [T]he arbitration provision states only that all 'grievances, complaints,
10     differences and disputes' may be submitted to arbitration.  The CBA
       does not expressly specify that all disputes, including those arising
       independently of the CBA, are subject to arbitration . . . .  As such, the
11     provisions of the CBA are too broad and general to demonstrate the
       requisite clear and unmistakable intent to submit to arbitration even
12     those claims unrelated to the CBA.

13  *Id.* at 440 (internal quotation marks and citation omitted).

14  Thus, these cases hold that even where an arbitration agreement purports to

15  extend to "all disputes" between the parties, that agreement must be interpreted to

16  limit arbitrable disputes to those related to the underlying contract and the legal

17  relationship of the parties as established by that contract.

18  Nothing in the cases GIP cites suggests otherwise.  In *Operating Engineers v.*

19  *Flair Builders, Inc.*, 406 U.S. 487 (1972), the plaintiff, a union, sought damages and

20  injunctive relief for the alleged breach of a CBA containing an arbitration clause that

21  provided for arbitration "of any difference . . . which cannot be settled within

22  48 hours of occurrence."  406 U.S. at 488.  There was no dispute that the plaintiff's

23  claims related to the CBA.  The district court held that the plaintiff was barred under

24  the doctrine of laches from enforcing the arbitration clause, because the plaintiff had

25  waited three years from the inception of the alleged breach to demand arbitration,

26  and the Court of Appeals affirmed.  *Id.* at 489.  The Supreme Court reversed, holding

27  that, based on the "any difference" language, the parties had agreed to arbitrate the

28  issue of laches.  *Id.* at 491.  The Court did not otherwise determine the scope of the

24

**OPPOSITION TO MOTION TO COMPEL ARBITRATION**

arbitration clause, noting that that issue "remains a matter for judicial decision." *Id.*

GIP also cites *Anders v. Hometown Mortg. Servs., Inc.*, 346 F.3d 1024 (11th Cir. 2003), in which the plaintiff signed an arbitration agreement with his mortgage broker in connection with a home purchase.  The agreement provided for the arbitration of any dispute "in connection with" the mortgage loan, as well any "past, present and future agreement between or among us (including the Security Instrument), and any past, present or future transactions between or among us." 346 F.3d at 1028.  The plaintiff later sued under the federal Truth in Lending Act and the Real Estate Settlement Procedures Act.  The plaintiff argued that the arbitration agreement did not apply to his claims because remedies that were available under the federal statutes under which he was suing were not available in arbitration.  The court rejected that argument, holding that the words "any and all disputes" encompassed statutory claims related to the loan.  *Id.* at 1027-28.  As in *Operating Engineers*, the court did not otherwise address the scope of the arbitration clause.

In the remaining cases cited by GIP, the arbitration clauses were specifically limited to disputes concerning the subject matter of the contracts in which they were incorporated.  *See AT&T Techs. v. Communs. Workers of Am.*, 475 U.S. 643, 650 (1986); *Mitsubishi Motors*, 473 U.S. at 617; *Simula*, 175 F.3d at 720.

### 2.    *Plaintiffs' Employment-Related Claims are Not Connected to the SHA.*

The cases cited above instruct that the SHA's "any dispute" language must be interpreted as applying to disputes arising out of or related to the SHA and to the legal relationships established by that agreement, which was between shareholders, not employers and employees.  Furthermore, since Section 13.2 of the SHA provides that Bronzelink and the Common Holders shall each select an arbitrator, the agreement expressly contemplates, and thus should be interpreted, as applying only to disputes between the Common Holders and Bronzelink, which is not named as a defendant in this action.

**OPPOSITION TO MOTION TO COMPEL ARBITRATION**

1    Plaintiffs have not alleged a breach of the SHA, and there is nothing about

2    their claims that would require the Court to interpret, apply, or even look to the SHA.

3    The legal rights giving rise to Plaintiffs' claims are created by the Employment

4    Agreements and California law protecting whistleblowers, not the SHA.

5    Accordingly, GIP's assertion that resolution of the Complaint would "necessitate[]

6    interpretation and application of the [SHA]" is simply wrong.  Motion, p. 9.

7    **C.    The Parol Evidence Rule Bars Consideration of Section 13.**

8    *1.    Because the Employment Agreements are Fully Integrated Written*

9    *Instruments, the Parol Evidence Rule Bars Evidence of the*

10   *Arbitration Clause in the SHA.*

11   "When the parties to a written contract have agreed to it as an 'integration' – a

12   complete and final embodiment of the terms of the agreement - parol evidence

13   cannot be used to add to or vary its terms.  When only part of the agreement is

14   integrated, the same rule applies to that part . . . ."  *Masterson v. Sine*, 68 Cal. 2d

15   222, 225 (1968); *see also* Cal. Code Civ. Proc. § 1856(a) ("Terms set forth in a

16   writing intended by the parties as a final expression of their agreement with respect

17   to the terms included therein **may not be contradicted** by evidence of a prior

18   agreement or of a contemporaneous oral agreement. . . . The terms set forth in a

19   writing described in subdivision (a) may be explained or supplemented by evidence

20   of consistent additional terms **unless the writing is intended also as a complete and**

21   **exclusive statement of the terms of the agreement**.") (emphasis added).[9]

22   ///

23

24   _____

     [9] Because the Employment Agreements are governed by California law, the Court
     should analyze the effect of the integration clause under that law.  *See Paracor Fin.,*

25   *Inc. v. Gen. Elec. Capital Corp.*, 96 F.3d 1151, 1164 (9th Cir. 1996) (choice of law
     provision generally controls); *Rutherford v. Palo Verde Health Care Dist.*, 2014 WL

26   12637902, at *6 n. 5 (C.D. Cal. Nov. 25, 2014) (holding that California parol
     evidence rule applied given employment agreements' choice of law provision

27   requiring application of California law); *see also Black v. Richfield Oil Corp.*, 41 F.
     Supp. 988, 993 (S.D. Cal. 1941) (federal district court sitting in California is bound

28   by the substantive law of the state concerning the applicability of parol evidence).

**OPPOSITION TO MOTION TO COMPEL ARBITRATION**

244055.10

a.   Plaintiffs' Employment Agreements are Fully Integrated.

Plaintiffs' Employment Agreements contain identical express integration clauses, which provide that:

> This Agreement contains the entire agreement between the parties, superseding in all respects any and all prior oral or written agreements or understandings pertaining to the employment of the Employee by the Company and shall be amended or modified only be written instrument signed by both parties hereto.

(Exhs. 8, 9, 14 and 15.)

Thus, there is no disputing that from the face of the Employment Agreements, the parties intended those agreements to be the final embodiment of the terms of Plaintiffs' employment.  The presence of such an integration clause is "very persuasive, if not controlling," on the issue of whether a written agreement is the "complete agreement."  *Banco Do Brasil, S.A. v. Latian, Inc.*, 234 Cal. App. 3d 973, 1003 (1991), *overruled on other grounds, Riversiland Cold Storage, Inc. v. Fresno-Madera Production Credit Association*, 55 Cal. 4th 1169 (2013); *see also Masterson*, 68 Cal. 2d at 225 (the "instrument itself may" resolve whether "the parties intended their writing to serve as the exclusive embodiment of their agreement" by "stat[ing], for example, that 'there are no previous understandings or agreements not contained in the writing'"); *Burch v. Premier Homes, LLC*, 199 Cal. App. 4th 730 (2011) (holding that agreement containing similar language was fully integrated).

In addition, Mr. Youssefzadeh and Mr. Javed both understood that their employment agreements were fully integrated, stand alone contracts whose provisions alone controlled the terms of their employment.  (U.J. Decl., ¶ 40; E.Y. Decl., ¶ 32.)

**2.   *Evidence of Section 13 of the SHA is Barred Under the Parol Evidence Rule Because it Would Directly Contradict the Employment Agreements.***

As set forth above, Section 13 provides that the SHA "shall be governed by and construed in accordance with the laws of England and Wales" and that "any

**OPPOSITION TO MOTION TO COMPEL ARBITRATION**

1  dispute shall be resolved through final and binding arbitration in Hong Kong

2  administered by the [HKIAC]."  SHA, § 13.  The choice of law and arbitration

3  provisions not only both appear in Section 13 but are interrelated, as the only reason

4  for selecting the law of England and Wales is that the arbitration tribunal was located

5  in Hong Kong, a former British colony.

6      Section 13 is inconsistent with Plaintiffs' Employment Agreements, which

7  provide that "[t]he laws of the State of California shall govern this Agreement" and

8  omit any reference to arbitration or any alternative dispute resolution ("ADR")

9  mechanism.  (*See* Exhs. 8, 9, 14 and 15.)  Under the parol evidence rule, the terms of

10  the Employment Agreements "may not be contradicted" by evidence of language

11  from the SHA, and such evidence is barred.  *See Banco Do Brasil*, 234 Cal. App. 3d

12  at 1002-03 (claimed agreement that bank would extend $2 million line of credit

13  could not be considered because it directly contradicted written guaranty stating

14  obligation was "absolute and unconditional").

15      Furthermore, California courts have consistently precluded the introduction of

16  parol evidence of a term that naturally would have been included in a subsequent

17  integrated agreement if the parties had intended it to apply.  *See, e.g., Singh v.*

18  *Southland Stone*, 186 Cal.App.4th 338 (2010) (trial court properly instructed jury not

19  to consider former employee's visa petition as evidence of a collateral agreement

20  regarding length of employment contract, where employment contract was integrated

21  and, though silent on the term of employment, the length of the contract would have

22  been included in the written agreement if the parties had agreed to such a term);

23  *Apex LLC v. Sharing World, Inc.*, 206 Cal. App. 4th 999, 1015-16 (2012) (language

24  of a prior agreement is inconsistent with a subsequent integrated agreement where

25  there is an "absence of reasonable harmony in terms of the language and respective

26  obligations of the parties"); *Mobile Oil Corp. v. Handley*, 76 Cal. App. 3d 956

27  (1978) (renewal provisions of lease were a "natural" inclusion of the lease and

28  almost inevitably would have been found in the lease proper, not in a collateral

1  agreement, and parol evidence of contrary representations as to its term were not

2  admissible); *Brawthen v. H&R Block, Inc.*, 28 Cal. App. 3d 131 (1972) ("[Parol

3  proof] is to be disallowed if additional terms are such that, if agreed upon, they

4  would certainly have been included in the document in the view of the court.");

5  *Grey v. American Management Services*, 204 Cal.App.4th 803, 805 (2012) (contract

6  containing a broad arbitration clause had been superseded by a subsequent integrated

7  employment agreement; accordingly, dispute was not arbitrable.).

8         In this case, the parties omitted ***any*** reference to arbitration in the Employment

9  Agreements and cannot conceivably have intended to arbitrate employment disputes

10  before a Hong Kong arbitration tribunal.  (U.J. Decl., ¶ 41; E.Y. Decl., ¶ 34.)

11  Moreover, it is only natural and probable that if they had intended to resolve any

12  dispute pertaining to Plaintiff's employment through arbitration, they would have

13  made this explicit in the Employment Agreements.  But they did not.

14         Accordingly, GIP's evidence of Section 13 is barred under section 1856(a).

15  **3.      *Evidence of Section 13 is Also Barred Under the Parol Evidence Rule***

16  ***Because the Employment Agreements Were Intended as the Complete***

17  ***and Exclusive Statement of the Parties' Agreement.***

18         Evidence of the arbitration clause in Section 13 is also barred under

19  *subdivision (b)* of California Code of Civil Procedure section 1856.  There can be no

20  doubt that the parties intended the Employment Agreements to be the "complete and

21  exclusive statement" of Plaintiffs' employment relationships with GIP-Cayman and

22  GIP-USA.  Cal. Code Civ. Proc. § 1856(b).  The integration clauses in the

23  Employment Agreements specifically provide that "[t]his Agreement contains the

24  entire agreement between the parties, superseding in all respects any and all prior

25  oral or written agreements or understanding pertaining to the employment of the

26  Employee by the Company and shall be amended or modified only by written

27  instrument signed by both of the parties hereto."  (Exhs. 8, 9, 14 and 15.)  Plaintiffs'

28  declarations further establish that each of them intended the Employment

1  Agreements to be a complete and exclusive expression of their employment

2  relationships, and, although aware of the issue, GIP has not proffered any contrary

3  evidence.  (U.J. Decl., ¶ 40; E.Y. Decl., ¶ 32.)

4       Finally, the parties had previously entered into Advisory Agreements which

5  expressly contradicted Section 13, and GIP has not offered any reason why, if a prior

6  agreement applies, it should be the SHA rather than the Advisory Agreements.

7       The cases cited by GIP – *Ramirez-Baker v. Beazer Homes, Inc.*, 636 F. Supp.

8  2d 1008 (E.D. Cal. 2008), *Reynoso v. Bayside Management Company LLC*,

9  2013 WL 6173765 (N.D. Cal. Nov. 25, 2013), and *Ryan v. BuckleySandler, LLP*,

10  69 F. Supp. 3d 140 (D.D.C. 2014) – do not compel a different result.

11       To begin with, each of those cases involved more limited integration clauses.

12  In *Ramirez-Baker*, the scope of the integration clause was limited to "the subject

13  matter covered" in the plaintiff's employment contracts; namely, the express terms

14  of the employment contracts.  636 F. Supp. 2d at 1016.  In *Reynoso*, the court found

15  that the paragraph was "not a 'final and complete expression of the parties'

16  employment agreement" 2013 WL 6173765, at *4.  And *Ryan* involved a separation

17  agreement which by its terms was "expressly limited" to "the subject matter hereof."

18  *Id.* at 145.

19       By contrast, here the Employment Agreements unequivocally set forth "the

20  **entire agreement** between the parties, superseding **in all respects** any and all prior

21  oral or written agreements or understandings pertaining to [Plaintiffs'] employment."

22  (Exhs. 8, 9, 14 and 15.) (emphasis added).  Thus, they are not limited only to the

23  express terms of the agreements or to a particular aspect of Plaintiffs' employment.

24       Additionally, in each of the cases GIP cites, the arbitration clause was set forth

25  in the employment contract itself.  In this case, the only prior employment contracts

26  are the Advisory Agreements which do not contain arbitration clauses; moreover, the

27  SHA and the SPA (1) are not employment contracts and do not contain any of the

28  terms of Plaintiffs' employment; (2) involve parties that were not parties to the

30

**OPPOSITION TO MOTION TO COMPEL ARBITRATION**

1  Employment Agreements; and (3) cannot reasonably be read as supplementing the
2  Employment Agreements.

3          Further, none of the cases GIP cites concerned prior arbitration agreements
4  that directly contradicted the subsequent employment agreements.  As noted above,
5  Section 13 directly contradicts paragraph 6 of the Employment Agreements.

6          Lastly, the cases cited by GIP were issued by district courts in other districts,
7  and therefore are neither binding on this Court nor authoritative pronouncements of
8  California law.

9          Accordingly, the authorities GIP cites are readily distinguishable, involve very
10  different facts, and, in any event, are not controlling.

11  **D.     If the Court Compels Arbitration Against GIP-Cayman, It Should Deny**
12  **GIP's Request to Stay This Action as to GIP-USA and Dong Yin.**

13          As set forth above, under the express terms of the Convention and *Yang*, this
14  Court lacks jurisdiction to compel GIP-USA and Dong Yin to arbitration, and the
15  Motion should also be denied as to GIP-Cayman for the reasons just stated.  If the
16  Court nevertheless grants the Motion as to GIP-Cayman, the Court should deny
17  GIP's request to stay this litigation pending the conclusion of arbitration.

18          As the party seeking the stay, GIP has the burden of demonstrating that
19  circumstances weigh in favor of staying the action against GIP-USA and Dong Yin
20  until the completion of arbitration.  *See Nken v. Holder*, 556 U.S. 418, 433-34
21  (2009); *Landis v. North American Co.*, 299 U.S. 248, 255 (1936).  GIP has not met
22  its burden.  It merely asserts that a stay would be "preferable" because "the outcome
23  of the arbitration will necessarily impact all claims asserted in the [Whistleblower]
24  Complaint against all parties."  Motion, p. 26.  This is not the legal standard and is
25  not true in any event.

26          In *CMAX, Inc. v. Hall*, 300 F.2d 265, 268 (9th Cir. 1962), the Ninth Circuit set
27  forth the factors that a district court must weigh in determining whether to stay an
28  action: (1) "the possible damage which may result from the granting of a stay";

31

**OPPOSITION TO MOTION TO COMPEL ARBITRATION**

(2) "the hardship or inequity which a party may suffer in being required to go forward"; and (3) "the orderly course of justice measured in terms of the simplifying or complicating of issues, proof, and questions of law which could be expected to result from a stay."

None of the *CMAX* factors weigh in favor of staying this action. **First**, staying this action will not only interfere with and delay Plaintiffs' ability to obtain a recovery, but will also permit GIP to continue to violate U.S. export control laws. **Second**, GIP has not, and cannot, identify any "hardship or inequity" it might suffer if the litigation against GIP-Cayman or Dong Yin is allowed to proceed. **Third**, staying this litigation will only result in unnecessary delay and will not "simplify . . . [any] issues, proof, and questions of law"; Plaintiffs have alleged separate causes of action against GIP-USA, Dong Yin and GIP-Cayman, so resolution of Plaintiffs' claims against GIP-Cayman will not eliminate the necessity of separately adjudicating Plaintiffs' claims against Dong Yin and GIP-USA.

GIP's request for a stay should be denied.

## IV.   CONCLUSION

For the foregoing reasons, GIP's Motion should be denied in its entirety.  If, however, the Court grants the Motion as to GIP-Cayman, it should not stay this action as to GIP-USA and Dong Yin.

DATED:  June 8, 2018                    Respectfully submitted,

                                        **ISAACS | FRIEDBERG LLP**


                                            */s/ Jerome H. Friedberg*
                                        Jerome H. Friedberg, Esq.
                                        Jeffrey B. Isaacs, Esq.
                                        Paige Shen, Esq.
                                        Robert Gookin, Esq.

                                        *Attorneys for Plaintiffs Emil Youssefzadeh and*
                                        *Umar Javed*

**OPPOSITION TO MOTION TO COMPEL ARBITRATION**
244055.10