JS-6

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

| EMIL YOUSSEFZADEH, an individual, and UMAR JAVED, an individual,<br><br>                    Plaintiffs,<br><br>         vs.<br><br>GLOBAL-IP CAYMAN, a Cayman Islands company; GLOBAL IP-USA, INC., a Delaware corporation; DONG YIN (HOLDINGS) LTD., a Hong Kong unlimited company; and DOES 1 through 50, inclusive,<br><br>                    Defendants. | CASE NO. 2:18-cv-02522-JLS-JCG<br><br><br>**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION TO COMPEL ARBITRATION & STAY JUDICIAL PROCEEDINGS (Doc. 20)** |
| --- | --- |

1

Before the Court is a Motion to Compel Arbitration and Stay Judicial Proceedings filed by Defendants Global-IP Cayman ("GIP-Cayman") and Global-IP USA, Inc.[1] ("GIP-USA").  (Mot., Doc. 20.)  Plaintiffs Emil Youssefzadeh and Umar Javed opposed, and Defendants replied.  (Opp., Doc. 22; Reply, Doc. 24.)  The Court also held a hearing on the Motion.  Having read the parties' briefs, reviewed the underlying evidence, and heard oral argument, the Court GRANTS IN PART and DENIES IN PART Defendants' Motion.

I.      **BACKGROUND**

A.      **The Agreements**

In 2008, Plaintiffs founded a project to build, launch, and operate a communications satellite to provide internet access to underserved parts of Africa.  (Compl. ¶ 2, Doc. 6-1.)  In April 2013, they formed GIP-Cayman as the entity that would own and operate the satellite.  (*Id.* ¶ 18.)  The shareholders of GIP-Cayman were Javed; STM Atlantic, an entity controlled by Youssefzadeh; and Steadyspace Limited ("Steadyspace"), an entity controlled by non-party Bahram Pourmand.  (U.J. Decl. ¶ 9, Doc. 22-1.)

In June 2016, in order to raise funding for the project, the shareholders sold a 75% controlling interest in GIP-Cayman to Bronzelink Holdings Limited ("Bronzelink"), a British Virgin Islands company headquartered in Hong Kong, in exchange for $175 million and a $25 million line of credit.  (Compl. ¶ 40.)  Defendant Dong Yin provided the financing for the deal.  (*Id.* ¶ 39; U.J. Decl. ¶ 14.)

The terms of the transaction were set forth in two agreements, the Share Purchase Agreement ("SPA") and the Shareholders Agreement ("SHA") (collectively, the "Investment Agreements").  (U.J. Decl. ¶¶ 11–13; SPA, Ex. 1, Doc. 22-3; SHA, Ex. 2, Doc. 22-3.)  The parties to the Investment Agreements were GIP-Cayman, STM Atlantic, Steadyspace, Pourmand, Youssefzadeh, Javed, Bronzelink, and non-party Amir Irani.  (SHA at 1.)

---

[1] Defendant Dong Yin did not join the Motion.

The terms of the SHA in particular are relevant to the instant Motion.  The SHA provided that Bronzelink was entitled to appoint six directors to GIP-Cayman's nine-person Board of Directors (the "Series A Directors") and that Youssefzadeh, Javed, and Pourmand would serve as the remaining three "Common Directors."  (*Id.* § 3.3.(a))  The boards of any of GIP-Cayman's subsidiaries were to have the same composition.  (*Id.* § 3.3(b).)  Moreover, the SHA set forth the authority of the Board to act on behalf of GIP-Cayman, the process by which individual Directors could notice Board meetings, the definition of a quorum for Board action, and the voting requirements for particular types of Board action.  (*Id.* §§ 3.6–3.9.)

Section 13 of the SHA concerned dispute resolution among signatories.  Section 13.1 provided that the terms of the SHA were "to be governed by the laws of England and Wales … ."  (*Id.* § 13.1.)  Section 13.2 provided that "[e]ach of the Parties irrevocably agrees that any dispute shall first be resolved amicably through direct negotiation among the Parties.  If an amicable resolution cannot be achieved within sixty (60) days after written notice of one Party to another, then any dispute shall be resolved through final and binding arbitration in Hong Kong … ." [2] (*Id.* § 13.2.)

Shortly after the sale to Bronzelink closed, Plaintiffs entered into "Executive Advisory Agreements" with GIP-Cayman in which they agreed to provide advisory services to GIP-Cayman on a part-time basis in return for a consulting fee.  (U.J. Decl. ¶ 25; Ex. 3, Doc. 22-4; Ex. 12, Doc. 22-5.)  The Advisory Agreements provided that the parties "submit themselves to the exclusive jurisdiction of the courts of California, and it is stipulated that venue shall be in Los Angeles County, California for the adjudication or disposition of any claim, action, or dispute arising out of this Agreement."  (*See* Ex. 3 § 7; Ex. 12 § 7.)

---

[2] The SPA contains virtually identical choice-of-law and arbitration provisions.  (SPA § 8.) However, the parties focus their arguments on the relationship between Plaintiffs' claims and the SHA in particular.

1   A few months later, in August 2016, GIP-USA was formed as the wholly-owned

2   U.S. operating subsidiary for GIP-Cayman.  (Compl. ¶ 45.)

3   Then, in October 2016, Plaintiffs entered into Employment Agreements with GIP-

4   Cayman and GIP-USA.  (*Id.* ¶¶ 48–58; U.J. Decl. ¶ 32; E.Y. Decl. ¶ 26, Doc. 22-2.)

5   Pursuant to the Employment Agreements, Youssefzadeh would serve as Chief Technical

6   Officer and Chairman of the Management Committee of both entities and Javed would

7   serve as the Chief Operating Officer and President.  (Exs. 8–9, Doc. 22-4; Exs. 14–15,

8   Doc. 22-5).  The Employment Agreements each contained a merger clause, which stated,

9   "This Agreement contains the entire agreement between the parties, superseding in all

10  respects any and all prior oral or written agreements or understandings pertaining to the

11  employment of the Employee by the Company … ."  (*See* Ex. 15 § 7.)  They also included

12  a choice of law clause, designating California law as the governing law.  (*Id.* § 6.)

13  However, the Employment Agreements were silent as to the forum for dispute resolution

14  and did not reference the Investment Agreements.

15

16      **B.**     **The Dispute**

17      Plaintiffs allege that in or about March of 2017, Plaintiffs became concerned that

18  the Series A Directors were allowing Dong Yin, the financer of the Bronzelink transaction,

19  to exercise control over the governance, management, and operations of GIP-Cayman and

20  GIP-USA in violation of the International Traffic in Arms Regulations ("ITAR"), 22

21  U.S.C. § 2778, and the Export Administration Regulations ("EAR"), 50 U.S.C. § 4610

22  (together, the "export control laws").  (Compl. ¶¶ 62–65.)  Plaintiffs allege that their

23  concerns were amplified when, in April 2017, Series A Director Yuen Cheung ("Tony")

24  Wong "assumed the position of 'Executive Director' of GIP-Cayman, with authority to act

25  on behalf of the GIP-Cayman Board of Directors, even though the corporate governance

26  documents did not recognize any such position."  (*Id.* ¶ 67.)

27

28

4

In response, Plaintiffs took steps to raise their concerns with the Board.  On May 24, 2017, Youssefzadeh noticed a Board meeting, but the Series A Directors declined to participate.  (*Id.* ¶¶ 70–71.)  He then re-noticed the meeting on June 2, 2017, but the Series A Directors again refused to meet.  (*Id.* ¶ 74.)

On June 4, 2017, the Common Directors sent a "Notice of Breach" to Bronzelink, in which they alleged various breaches of the SHA, including Plaintiffs' compliance concerns, the Series A Directors' refusal to approve debt financing, and Wong's assumption of the "Executive Director" position.  (Notice of Breach at 2–3, Ex. 11, Doc. 22-5.)

After sending the Notice of Breach, Plaintiffs allege that they met with Wong "in his capacity as an agent of Dong Yin," and he told them that they could not continue as employees of GIP-Cayman or GIP-USA if they wished to remain on the GIP-Cayman Board.  (Compl. ¶¶ 75–76.)

On June 14, 2017, Youssefzadeh noticed another Board meeting, but the Series A Directors again refused to attend.  (*Id.* ¶¶ 80–81.)  Instead, Wong noticed a Board meeting for June 29, 2017, and placed on the agenda whether to "accept" Plaintiffs' resignations, even though Plaintiffs had not yet tendered their resignations.  (*Id.* ¶ 82.)  On June 26, 2017, Plaintiffs resigned their positions as executives of GIP-Cayman and GIP-USA and later resigned as Directors.  (*Id.* ¶ 83.)

On February 23, 2018, Plaintiffs filed the instant action in California Superior Court, which was then removed to this Court.[3]  The Complaint alleges twenty-one claims against Defendants.  Specifically, Plaintiffs bring separate claims against GIP-Cayman and GIP-USA for (1) retaliation in violation of Cal. Labor Code § 1102.5 (claims one through

---

[3] Defendants, relying on Section 13.2 of the SHA, assert that the Court has federal question jurisdiction pursuant to Section 203 of the Federal Arbitration Act, which confers federal jurisdiction over any action or proceeding falling under the Convention on the Recognition and Enforcement of Foreign Arbitral Awards.  (*See* Notice of Removal ¶¶ 7–8, Doc. 1.)  Plaintiffs do not challenge that removal was proper.  (Opp. at 18 n.6.)

eight); (2) constructive wrongful termination in violation of public policy (clams nine through twelve); (3) breach of the Employment Agreements (claims thirteen through sixteen); and breach of the implied covenant of good faith and fair dealing (claims seventeen through twenty).  Plaintiffs also allege a single claim against Dong Yin for intentional interference with contractual relations (claim twenty-one).  (*Id.* ¶¶ 89–245.)

Defendants now seek to compel arbitration of Plaintiffs' claims against GIP-Cayman and GIP-USA and stay the instant proceedings pending arbitration.  (Mot.)

## II.   LEGAL STANDARD

In 1970, the United States ratified the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "Convention").  9 U.S.C. §§ 201–208.  "The Convention applies to an arbitration agreement arising out of a legal relationship, whether contractual or not, which is considered as commercial." *Balen v. Holland Am. Line Inc*., 583 F.3d 647, 654 (9th Cir. 2009).  The parties agree that the Convention governs the arbitration agreement set forth in Section 13.2 of the SHA.  (*See* Mem. at 17; Opp. at 17.)

"Courts generally address four factors to determine whether to enforce an arbitration agreement under the Convention." *Balen*, 583 F.3d at 654.  "These four require that (1) there is an agreement in writing within the meaning of the Convention; (2) the agreement provides for arbitration in the territory of a signatory of the Convention; (3) the agreement arises out of a legal relationship, whether contractual or not, which is considered commercial; and (4) a party to the agreement is not an American citizen, or that the commercial relationship has some reasonable relation with one or more foreign states." *Id.* at 654–55.

If these four factors are satisfied, then the Court "must determine whether the claims stated in the complaint are within the scope of the legal relationship defined in the [arbitration] agreement." *Vedachalam v. Tata Am. Int'l Corp.*, 477 F. Supp. 2d 1080, 1087 (N.D. Cal. 2007), *aff'd*, 339 F. App'x 761 (9th Cir. 2009).  This determination is a two-

step process.  First, the Court determines the scope of the arbitration clause at issue.  *Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 720 (9th Cir. 1999).  Second, the Court determines whether the factual allegations contained in the complaint fall within the scope of the arbitration clause, resolving all doubts "in favor of arbitrability."  *Id.* at 721.  Indeed, the Supreme Court has "emphasize[d] that the liberal federal policy favoring arbitration applies with particular force in the field of international commerce[.]"  *Id.* (*citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 631 (1985)).

If the Court finds that the parties agreed to arbitrate the claims contained in the Complaint, it must direct them to proceed to arbitration.  *Id.* at 719.

### III.   ANALYSIS

Defendants argue that arbitration is mandatory because Section 13.2 of the SHA ("Section 13.2") is valid, enforceable, and covers the claims asserted in the Complaint.  (Mem. at 19–22.)  Plaintiffs oppose on three grounds.  As a threshold matter, Plaintiffs argue the Parol Evidence Rule bars the Court's consideration of Section 13.2 altogether.  (Mem. at 26–31.)  Second, Plaintiffs argue that GIP-Cayman cannot compel arbitration because the allegations in the Complaint do not arise from or relate to the SHA.  (*Id.* at 21–26.)  Finally, Plaintiffs argue that GIP-USA cannot compel arbitration pursuant to the Investment Agreements because it was not a signatory to either contract.  (*Id.* at 17–20.)  The Court considers each in turn.

### A.   Parol Evidence Rule

Defendants argue Section 13.2 is not superseded by the Employment Agreements because they are silent as to the forum for dispute resolution.  (Mem. at 22–23; Reply at 11–12.)  Plaintiffs argue that the Parol Evidence Rule bars consideration of Section 13.2 because the subsequent Employment Agreements are integrated contracts and Section 13.2 "directly contradict[s] the Employment Agreements."  (Opp. at 26–30.)

1    Whether a valid, enforceable agreement to arbitrate exists is governed by principles

2    of California law.  *Ramirez-Baker v. Beazer Homes, Inc.*, 636 F. Supp. 2d 1008, 1015–

3    1017 (E.D. Cal. 2008).  Under the Parol Evidence Rule, "[w]hen the parties to a written

4    contract have agreed to it as an 'integration' — a complete and final embodiment of the

5    terms of an agreement — parol evidence cannot be used to add to or vary its terms."

6    *Masterson v. Sine*, 436 P.2d 561, 563 (Cal. 1968).  However, parol evidence is admissible

7    "to prove the existence of a separate [] agreement as to any matter on which the document

8    is silent and which is not inconsistent with its terms — even though the instrument

9    appear[s] to state a complete agreement."  *Id.* at 563–64.

10   Where parties to an arbitration agreement enter into a subsequent agreement that is

11   silent as to the selected forum for dispute resolution, the obligation to arbitrate is not

12   superseded even if the subsequent agreement is integrated.  *Cione v. Foresters Equity*

13   *Servs., Inc.*, 68 Cal. Rptr. 2d 167, 174–75 (Ct. App. 1997) ("Absent any showing that his

14   written employment agreement … was either expressly or implicitly inconsistent with his

15   arbitration obligation under [the prior agreement], [plaintiff] may not rely on the written

16   employment agreement's silence about dispute resolution to establish that such agreement

17   superseded his obligation to arbitrate."); *Jenks v. DLA Piper Rudnick Gray Cary U.S. LLP*,

18   196 Cal. Rptr. 3d 237, 250 (Ct. App. 2015); *Ramirez-Baker*, 636 F. Supp. 2d at 1016.

19   *Accord Ryan v. BuckleySandler, LLP*, 69 F. Supp. 3d 140, 146 (D.D.C. 2014) (applying

20   D.C. law); *Pelletier v. Yellow Transp., Inc.*, 549 F.3d 578, 581 (1st Cir. 2008) (applying

21   Maine law).  This is because "a contractual clause selecting either a judicial or an arbitral

22   forum for the resolution of disputes establishes a legal right which is analytically distinct

23   from the rights being asserted in the dispute to which it is addressed."  *Pelletier*, 549 F.3d

24   at 581; *see also Ryan*, 69 F. Supp. 3d at 145–46.

25   Therefore, even accepting Plaintiffs' contention that the Employment Agreements

26   are wholly integrated, (*see* Opp. at 27), Section 13.2 is not superseded because it is a

27   separate agreement that establishes the distinct legal right of the parties to arbitrate their

28

8

1   disputes.  *See Ryan*, 69 F. Supp. 3d at 146; *Ramirez-Baker*, 636 F. Supp. 2d at 1017;

2   *Cione*, 68 Cal. Rptr. at 175 ("[E]ven if we were to deem [the plaintiff's] written

3   employment agreement to be wholly integrated, we would nonetheless conclude [the

4   plaintiff's] arbitration agreement was not superseded.")

5        Moreover, the inconsistencies that Plaintiffs identify between the SHA and the

6   parties' subsequent agreements are not relevant to the arbitration obligation and thus do

7   not implicate the Parol Evidence Rule as to Section 13.2.  First, Plaintiffs point to the

8   conflicting choice of law provisions in the Employment Agreements and the SHA.  (*See*

9   Opp. at 28, *comparing* SHA § 13.1 *with* Ex. 15 § 6.)  However, choice of law is a "distinct

10   subject matter" from the choice of forum and thus is not a contradiction that supersedes

11   Section 13.2.  *See Ryan*, 69 F. Supp. 3d at 145–46.  Second, Plaintiffs point to the judicial

12   forum selection clauses in the Advisory Agreements and argue that Defendants have "not

13   offered any reason why, if a prior agreement applies, it should be the SHA rather than the

14   Advisory Agreements."  (Opp. at 30.)  The problem with this argument is that the forum

15   selection clauses in the Advisory Agreements were specifically limited to claims arising

16   out of those agreements.  (*See* Exs. 3, 12 at § 7.)  Thus, the Advisory Agreements have no

17   bearing on the forum for resolution of claims arising out of the Employment Agreements,

18   which are silent on this issue.

19        At oral argument, Plaintiffs urged the Court to consider the holding in *Grey v.*

20   *American Management Services*, 139 Cal. Rptr. 3d 210 (Ct. App. 2012).  (*See* Opp. at 29.)

21   In *Grey*, the California Court of Appeal found that the parties' integrated employment

22   agreement, which required arbitration of claims "arising out of the alleged breach of any

23   other provision of this Agreement," superseded the parties' earlier arbitration agreement,

24   which reached a broader set of claims.  139 Cal. Rptr. at 212–13.  *Grey* is thus

25   distinguishable on its facts; there, the subsequent employment agreement was not silent as

26   to arbitration, but, rather, specifically narrowed the scope of arbitrable claims and thereby

27   contradicted the terms of the earlier arbitration agreement.  *Id.* at 212.  Here, by contrast,

28

1    the Employment Agreements contain no such contradiction.  They are silent as to the

2    parties' selected forum for dispute resolution and thus do not, by their silence, supersede

3    Section 13.2.  *Cione*, 68 Cal. Rptr. at 174–75.

4           Thus, because Section 13.2 constitutes a separate agreement that is not inconsistent

5    with the terms of the Employment Agreements, the Parol Evidence Rule is inapplicable.

6    *Masterson*, 436 P.2d at 563.

7

8                          **B.    GIP-Cayman**

9           Defendants argue that Plaintiffs' claims against GIP-Cayman must be arbitrated

10   because they "touch matters" covered by the SHA and therefore fall within the scope of

11   Section 13.2.  (Mem. at 20–22.)  Plaintiffs concede that Section 13.2 is enforceable by

12   GIP-Cayman as a signatory to the SHA, but they argue that the claims stated in the

13   Complaint are unrelated to the SHA and therefore cannot be compelled to arbitration.

14   (Opp. at 21–26.)

15          As Plaintiffs point out, the scope of Section 13.2 is "strikingly broad," as it purports

16   to cover "any dispute" that arises between signatories.  (SHA § 13.2; Opp. at 22, *citing*

17   *Wexler v. AT & T Corp.*, 211 F. Supp. 3d 500, 502 (E.D.N.Y. 2016)).  Accordingly,

18   Plaintiffs urge the Court to construe Section 13.2 to cover only those disputes "arising out

19   of, or related to" the SHA.  (Opp. at 22–25.)  Defendants do not oppose this construction.

20   (Reply at 7.)  Accordingly, the sole question before the Court as to GIP-Cayman is

21   whether Plaintiffs' claims "arise out of or relate to" the SHA and thus must be arbitrated.

22          When parties agree to arbitrate any claims that "aris[e] in connection with" the

23   contract containing the arbitration clause, the factual allegations need only "'touch matters'

24   covered by the [underlying contract] in order to require arbitration, and all doubts are to be

25   resolved in favor of arbitrability."  *Simula*, 175 F.3d at 721.  "The 'touch matters' test does

26   not require a contractual-interpretation element."  *Trico Elec. Coop., Inc. v. Sensus USA,*

27   *Inc.*, No. CV 11-182 TUC-DCB, 2011 WL 13233552, at *3 (D. Ariz. Nov. 8, 2011); *In re*

28

1    *TFT-LCD (Flat Panel) Antitrust Litig.*, No. C 09-05609 SI, 2011 WL 2650689, at *5 (N.D.

2    Cal. July 6, 2011).

3         The Court has no trouble concluding that Plaintiffs' allegations pertaining to GIP-

4    Cayman "touch matters" covered by the SHA.   *Simula*, 175 F.3d at 721.   At the core of

5    Plaintiffs' claims is the conduct of the Series A Directors, including their failure to comply

6    with the export control laws, their refusal to attend Board meetings convened by Plaintiffs

7    to discuss remedies, and Wong's improper assumption of the "Executive Director" role.

8    (*See, e.g.,* Compl. ¶¶ 67–83.)   These allegations necessarily "touch on" the process for

9    convening a Board meeting, the definition of a quorum for Board action, and the voting

10   requirements to make a structural change to the Board, all of which are contained in the

11   SHA.   (*See* SHA §§ 3.6–3.9.)   From a more general perspective, too, the SHA is "at the

12   very core of this dispute."   *Ever-Gotesco Res. & Holdings, Inc. v. PriceSmart, Inc.*, 192 F.

13   Supp. 2d 1040, 1043 (S.D. Cal. 2002).   The SHA creates and defines the legal

14   relationships between Bronzelink, the Series A Directors, and GIP-Cayman.   (*See* SHA §

15   3.3.)   Ultimately, it is the allegedly conflicted nature of these relationships that led

16   Plaintiffs to undertake the efforts that resulted in their constructive termination.

17        The Notice of Breach sent by Plaintiffs to Bronzelink confirms this conclusion.

18   Specifically, the Notice of Breach made some of the very same allegations as those

19   contained in the Complaint, such as Plaintiffs' compliance concerns and Wong's conduct,

20   both of which allegedly ran afoul of the SHA.   (*See* Notice of Breach at 2–3; Compl. ¶¶ 62,

21   67.)   That Plaintiffs did not bring a breach of contract claim under the SHA is of no

22   moment: "[i]t is not the legal label assigned to a claim but the substance of the underlying

23   allegations that determine[s] whether claims are arbitrable."   *Hinson v. Jusco Co.*, 868 F.

24   Supp. 145, 149 (D.S.C. 1994).

25        Accordingly, Defendants have shown both that Section 13.2 is a valid arbitration

26   agreement between Plaintiffs and GIP-Cayman and that the factual allegations contained in

27

28

the Complaint fall within the scope of the agreement to arbitrate.  Therefore the Court
GRANTS the Motion to Compel Arbitration as to the claims against GIP-Cayman.

### C.      GIP-USA & Dong Yin

Defendants argue that GIP-USA, though not a signatory to the Investment
Agreements, can compel arbitration of the claims against it under principles of agency and
equitable estoppel.  (Mem. at 24.)  Plaintiffs respond that, as a non-signatory, GIP-USA[4]
cannot compel arbitration pursuant to the Investment Agreements under any legal theory.
(Opp. at 17.)

In *Yang v. Majestic Blue Fisheries, LLC*, the Ninth Circuit held that arbitration
agreements arising under the Convention are enforceable only by a party who is a
signatory to the agreement under which it moves to compel.  876 F.3d 996, 1001 (9th Cir.
2017).  Moreover, the Court held that a litigant may not circumvent the Convention's
requirements under the state law exceptions of equitable estoppel, agency, or alter ego.  *Id.*
at 1002–1004.

Thus, *Yang* directly forecloses Defendants' arguments, and Defendants' citations to
out-of-circuit holdings that contradict *Yang* are unconvincing.  (Reply at 14–15.)
Defendants also contend that *Yang* is limited to contracts of employment for seamen, (*id.*
at 14), but this argument finds no support in *Yang* or elsewhere.  To the contrary, *Yang*
applies where, as here, the moving party seeks to compel arbitration pursuant to the
Convention.  876 F.3d at 1001–1002.

Accordingly, GIP-USA cannot avail itself of the Investment Agreements'
arbitration provisions and the Motion to Compel Arbitration is DENIED as to the claims
against GIP-USA.

---

[4] Plaintiffs note that the same reasoning applies to Dong Yin, (Opp. at 17 n.5), but the Court
need not reach this argument since Dong Yin did not move to compel arbitration.

### D.   <u>Request for Stay</u>

Defendants argue that the Court should stay the entire action pending arbitration of arbitrable claims because "[a]ll claims depend on the same basic set of facts."  (Mem. at 26.)  Plaintiffs argue that a stay will cause an unnecessary delay in their ability to obtain recovery.  (Opp. at 31–32.)

Under 9 U.S.C. § 3, a stay is mandatory as to all arbitrable claims. Therefore, the Court must stay the claims against GIP-Cayman.

As to non-arbitrable claims against non-signatory defendants, however, the Court may stay the proceedings in its discretion to control its docket.  *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 20, n.23 (1983).  In determining whether a stay is warranted, courts look to whether the claims asserted against the signatory defendant are interconnected with the claims asserted against the non-signatory defendants.  *See Ballard v. Corinthian Colleges, Inc.*, No. C06-5256 FDB, 2006 WL 2380668, at *2 (W.D. Wash. Aug. 16, 2006).  A stay is justified where the arbitrable claims are essentially inseparable from the non-arbitrable claims.  *Id.*; *Hill v. G E Power Sys., Inc.*, 282 F.3d 343, 347–48 (5th Cir. 2002); *Patnik v. Citicorp Bank Tr. FSB*, 412 F. Supp. 2d 753, 762 (N.D. Ohio 2005); *Powell v. Gulf States, Inc.*, No. C 04-5185 MJJ, 2005 WL 757509, at *4 (N.D. Cal. Apr. 4, 2005); *Volkswagen Of Am., Inc. v. Sud's Of Peoria, Inc.*, 474 F.3d 966, 971–72 (7th Cir. 2007).

The Court finds a stay appropriate here.  As to GIP-USA, Plaintiffs' claims are factually and legally identical to the claims asserted against GIP-Cayman.  Moreover, because GIP-USA is a wholly-owned subsidiary of GIP-Cayman, its actions were likely dictated by GIP-Cayman's Board.  Therefore, to the extent that GIP-USA's liability is ultimately derivative of GIP-Cayman's liability, findings by this Court could have a "critical impact" on GIP-Cayman's right to arbitrate.  *Powell*, 2005 WL 757509, at *4.  As to Dong Yin, Plaintiffs' claim of intentional interference turns on the allegation that Dong Yin's conspiracy with the Series A Directors "created intolerable working conditions" that

forced Plaintiffs' resignations.  (Compl. ¶ 241.)  Thus, Dong Yin's liability is also tied directly to the conduct that will be the subject of GIP-Cayman's arbitration with Plaintiffs. In sum, "given the interdependence of the claims, simultaneous litigation of such claims in separate forums would likely lead to a duplication of effort, as well as the risk of inconsistent decisions and inefficiencies."  *Ballard*, 2006 WL 2380668, at *2.

Accordingly, the Motion is GRANTED as to the request for a stay.

## IV.    CONCLUSION

Based on the foregoing, the Court GRANTS Defendants' Motion to Compel Arbitration as to GIP-Cayman and DENIES the Motion as to GIP-USA.  Moreover, the Court STAYS the proceedings pending arbitration between Plaintiffs and GIP-Cayman.

Plaintiffs and GIP-Cayman are ORDERED to file a joint status report at the earlier of six months from the date of this Order or within **ten (10) days** of the completion of arbitration.  This action shall remain stayed until further order of the Court.

DATED:  July 30, 2018

_____
JOSEPHINE L. STATON
UNITED STATES DISTRICT JUDGE